T.C. Memo 2002-97

UNITED STATES TAX COURT

ANDANTECH L.L.C., WELLS FARGO EQUIPMENT FINANCE, INC. (f.k.a. NORWEST EQUIPMENT FINANCE, INC.), TAX MATTERS PARTNER, AND WELLS FARGO & COMPANY (f.k.a. NORWEST CORPORATION), A PARTNER OTHER THAN THE TAX MATTERS PARTNER, ET AL.,[1] Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 15532-98, 4277-00, 6348-00.          Filed April 9, 2002.

On Sept. 28, 1993, A, a limited liability Wyoming company, composed of two Belgian citizens, BP and FBE, purchased a portfolio of 40 IBM mainframe computers (the equipment) from C, for $122,415,762, which was paid: (1) $14,995,931 in cash (which A borrowed from UBS, a Swiss bank), and (2) $107,419,831 by A's notes to C.  At the time of sale, the equipment was under existing leases to end users and subject to existing liens; the equipment was sold to A subject to the existing leases and liens.

Simultaneously with its purchase of the equipment, A leased the equipment back to C.

---

[1]     Cases of the following petitioners are consolidated herewith:  Andantech L.L.C., Equipment Investors Co., Inc., A Partner Other Than The Tax Matters Partner, docket Nos. 4277-00 and 6348-00.

On Oct. 29, 1993, A sold a portion of the rents due from C to NationsBank for $87,805,802. The sale of the rents caused a portion ($87,805,802) of A's note to C to accelerate, and the proceeds A received from the sale were paid to C.

On Dec. 9, 1993, FBE entered into an agreement with EICI pursuant to which FBE assigned his 2-percent interest in A to EICI.

On Dec. 10, 1993, BP entered into an agreement with RDL, a subsidiary of NEFI, pursuant to which (1) BP exchanged his 98-percent interest in A for 6,150 shares of preferred stock in RDL, and (2) NEFI agreed to contribute $14,817,382 in cash to RDL in exchange for 100 shares of RDL common stock.

BP's transfer of his 98-percent interest in A caused an acceleration of A's note to UBS. As a result, RDL and EICI contributed $14,817,382 and $302,396, respectively, to the capital of A. A used these amounts (totaling $15,119,778) to pay the principal and interest due under its note to UBS.

On its Federal income tax return for the short period from Sept. 28 to Dec. 10, 1993 (the 12/10/93 short period), A reported net income of $86,930,096 that was allocated to BP, FPE, and EICI. On its Federal income tax return for the short period from Dec. 11 to Dec. 31, 1993 (the 12/31/93 short period), A reported a $2,143,937 loss (consisting of depreciation deductions and interest expense). A reported a $50,069,397 loss for 1994 (also consisting of depreciation deductions and interest expense).

Respondent determined that the sale-leaseback transaction described above was a prearranged transaction that lacked business purpose as well as economic substance. Consequently, in FPAAs issued to A, respondent determined that the losses claimed by A ($2,143,937 for the 12/31/93 short period and $50,069,397 for 1994) should be disallowed. Additionally, respondent determined that A should have reported $87,805,801 of income for the 12/31/93 short period.

Held: A is disregarded because BP and FPE did not intend to join together for the purpose of carrying on a business as partners or sharing in the profits and losses from an equipment leasing activity.

Held, further, alternatively, participation of BP, FBE, and EICI in the sale-leaseback transaction described above is disregarded under the step transaction doctrine.

Held, further, the sale-leaseback transaction described above lacked a valid business purpose, as well as economic substance, and thus is not to be respected for Federal tax purposes. Consequently, (1) A is not required to include the sale of the rents ($87,805,801) as income for the 12/31/93 short period, (2) A is not entitled to deduct $2,143,937 as expenses from "other rental activities" for the 12/31/93 short period, and (3) A is not entitled to deduct $50,069,397 of similar expenses for 1994.

Mark Alan Hager, Walter A. Pickhardt, John R. Kalligher, William K. Wilcox, and Myron L. Frans, for petitioners in docket No. 15532-98.

Walter A. Pickhardt, Mark Alan Hager, and William K. Wilcox, for petitioner in docket No. 4277-00.

Walter A. Pickhardt, for petitioner in docket No. 6348-00.

Robert M. Ratchford, Donna C. Hansberry, John C. Schmittdiel, and Robert J. Burbank, for respondent.

CONTENTS

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . 7

I.   Norwest and Its Affiliated Group . . . . . . . . . . . . . 7
     A.   Norwest . . . . . . . . . . . . . . . . . . . . . . 7
     B.   NEFI . . . . . . . . . . . . . . . . . . . . . . . . 8

II.  Comdisco and CIG . . . . . . . . . . . . . . . . . . . . . 8

III. Negotiations . . . . . . . . . . . . . . . . . . . . . . . 12
     A.   CIG's Initial Discussions With Norwest and NEFI . . 12
     B.   NEFI's Credit Approval Presentation . . . . . . . . 14
     C.   Financial Projections and Appraisals . . . . . . . 16
     D.   The Foreign Investors . . . . . . . . . . . . . . . 25

IV.  Formation of Andantech and the Sale-Leaseback (Appendixes
     A, B, and C) . . . . . . . . . . . . . . . . . . . . . . . 28
     A.   The Purchase Price . . . . . . . . . . . . . . . . . 30
     B.   The Equipment Lease . . . . . . . . . . . . . . . . 31
     C.   The Bank Loan . . . . . . . . . . . . . . . . . . . 37

V.   Sale of Comdisco Rents (Appendix D) . . . . . . . . . . . 39

VI.  Mr. de la Barre d'Erquelinnes's and Mr. Parmentier's
     Withdrawal From Andantech . . . . . . . . . . . . . . . . 41
     A.   Mr. de la Barre d'Erquelinnes's and Mr.
          Parmentier's Withdrawal of Capital Contributed to
          Andantech . . . . . . . . . . . . . . . . . . . . . 41
     B.   Transfer of Mr. de la Barre d'Erquelinnes's
          Membership Interest in Andantech to EICI (Appendix
          E) . . . . . . . . . . . . . . . . . . . . . . . . . 41
     C.   Transfer of Mr. Parmentier's Membership Interest to
          RD Leasing in Exchange for Preferred Stock
          (Appendix F) . . . . . . . . . . . . . . . . . . . . 42

VII. Repayment of Bank Loan (Appendixes F and G) . . . . . . . 43

VIII. Sale of Computer to End User . . . . . . . . . . . . . . 44

IX.  Comdisco's Exercise of Early Termination Options . . . . 45

X.   Dissolution of RD Leasing and Andantech . . . . . . . . . 50

XI.  Andantech's Federal Income Tax Returns . . . . . . . . . 50

XII. Respondent's Determinations . . . . . . . . . . . . . . . 52
     A.   FPAAs for the 1993 Short Years . . . . . . . . . . . 52
     B.   FPAA for the 1994 Taxable Year . . . . . . . . . . . 53

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

I.   Procedural Issues . . . . . . . . . . . . . . . . . . .  53

II.  Whether the Sale-Leaseback Transaction Should Be
     Respected . . . . . . . . . . . . . . . . . . . . . . .  55
     A.  Overview of Statutory Framework for the
         Transactions . . . . . . . . . . . . . . . . . . .  56
     B.  Positions of the Parties . . . . . . . . . . . . .  61
     C.  Analysis . . . . . . . . . . . . . . . . . . . . .  62
         1.  Andantech Is Not a Valid Partnership and Is
             Not Recognized for Federal Tax Purposes . . .  64
             a.  Andantech-Foreign Should Be Disregarded
                 Because Messrs. Parmentier and de la
                 Barre d'Erquelinnes Did Not Intend To
                 Join Together for the Purpose of Carrying
                 On a Business and Sharing in the Profits
                 or Losses From the Equipment Leasing
                 Activity . . . . . . . . . . . . . . . . .  65
             b.  Andantech-US Should Be Disregarded
                 Because EICI Did Not Intend To Join With
                 RD Leasing for the Purpose of Carrying On
                 Partnership Business and Sharing in the
                 Profits or Losses From the Partnership's
                 Equipment Leasing Activity . . . . . . .  68
         2.  Andantech Acted as a Mere Shell or Conduit To
             Strip the Income From the Transaction and
             Avoid Income Taxation and, Under the Step
             Transaction Doctrine, Should Be Disregarded .  69
             a.  Binding Commitment Test . . . . . . . . .  71
             b.  End Result Test . . . . . . . . . . . . .  72
             c.  Interdependence Test . . . . . . . . . .  75
         3.  The Sale-Leaseback Transaction Lacked Business
             Purpose and Economic Substance . . . . . . .  82
             a.  The Experts . . . . . . . . . . . . . . .  84
             b.  No Reasonable Possibility for Profit
                 Existed . . . . . . . . . . . . . . . . .  89
             c.  RD Leasing/Norwest Was Not Motivated by
                 Any Business Purpose Other Than Obtaining
                 Tax Benefits . . . . . . . . . . . . . .  95
                 i.   Presence or Absence of Arm's-Length
                      Price Negotiations . . . . . . . . .  97
                 ii.  The Relationship Between the Selling
                      Price and the Fair Market Value . .  99
                 iii. The Structure of the Financing . . .  99
                 iv.  The Degree of Adherence to
                      Contractual Terms . . . . . . . . . 102
                 v.   The Reasonableness of the Income and

Residual Value Projections . . . . . 104
vi. Insertion of Other Entities . . . . 106
4. The Transaction Was Not a Sale and the
Financing Did Not Constitute Genuine Debt . . 108
D. Conclusion . . . . . . . . . . . . . . . . . . . . 112

APPENDIX A . . . . . . . . . . . . . . . . . . . . . . 114

MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, Judge:  Respondent issued Andantech, L.L.C. (Andantech), a limited liability Wyoming company, notices of final partnership administrative adjustment (FPAAs) that reflected adjustments to Andantech's partnership returns for taxable years which ended on December 10, 1993 (the 12/10/93 FPAA), December 31, 1993 (the 12/31/93 FPAA), and December 31, 1994 (the 12/31/94 FPAA).

These consolidated cases involve an equipment sale-leaseback transaction that is described in flow chart form, in attached appendixes A through G.  The transaction is designed to produce tax benefits to RD Leasing, Inc. (RD Leasing), a member of an affiliated group in which Norwest Corp. (Norwest) is the common parent, through RD Leasing's membership in Andantech.

The substantive issue to be resolved is whether the sale-leaseback transaction involved herein should be respected for Federal tax purposes.

All section references are to the Internal Revenue Code as in effect for the years in issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulations of facts and the attached exhibits are incorporated herein by this reference.

I. Norwest and Its Affiliated Group

A. Norwest

At all relevant times, Norwest was a Delaware corporation, maintaining its principal place of business in Minneapolis, Minnesota. In 1998, Norwest merged with Wells Fargo & Co. Norwest was the surviving corporation, but it subsequently changed its name to Wells Fargo & Co.

Norwest is a bank holding company registered with the Federal Reserve Bank under the Bank Holding Company Act of 1956. Norwest's affiliates provide banking and other financial services. From 1993 through 1996, Norwest and its affiliated corporations filed consolidated Federal income tax returns. Norwest is a publicly held company whose stock is traded on the New York Stock Exchange and on the Midwest Stock Exchange.

J. Daniel Vandermark was Norwest's senior vice president of tax; he reported to John Thornton, Norwest's chief financial officer. All sale-leasebacks had to be approved by Mr. Vandermark.

B. NEFI

Norwest Equipment Finance, Inc. (NEFI), now known as Wells Fargo Equipment Finance, Inc., is a Minnesota corporation engaged in the business of equipment leasing. At all relevant times, NEFI

was a wholly owned subsidiary of Norwest Bank Minnesota, N.A. (NBM), which in turn was a wholly owned subsidiary of Norwest.

NEFI was actively involved in leasing transactions involving "middle market" equipment (i.e., equipment having a market value between $25,000 and $2 million). NEFI was also involved, albeit to a lesser extent, in leasing transactions involving higher end equipment.

Within the Norwest group, sale-leasebacks were usually taken in the name of NEFI's parent, NBM. James Renner was president of NEFI. Phyllis Grossman was vice president of sale-leaseback transactions for NEFI. She was primarily responsible for reviewing the structure of, and overseeing the completion of, all proposed sale-leaseback transactions.

NEFI employed the law firm of Faegre & Benson (and used the services of David Beadie and John Steffen) to render legal advice with respect to the sale-leaseback transaction involved herein.

II. Comdisco and CIG

Comdisco, Inc. (Comdisco), is a Delaware corporation with its principal place of business in Rosemont, Illinois. Comdisco is a publicly held corporation whose stock is traded on the New York Stock Exchange. Comdisco is a lessor, dealer, and remarketer of computer equipment. In 1993, it was the largest independent computer leasing company in the United States.

Comdisco purchases computers primarily through debt financing. After entering into a lease with a customer (existing lease),

Comdisco borrows, on a nonrecourse basis, an amount equal to the present value of the rental payments due under the lease (existing financing) from a financial institution or insurance company. Such borrowing is secured by an assignment of the rents and a lien on the equipment (existing lien). Comdisco rarely obtains sufficient proceeds from the existing financing to fund the total cost of the equipment. (The balance of the equipment cost is referred to as the equity portion. The equity portion ranges from 10 to 25 percent of the cost of the equipment, depending on the length of the lease and the type of equipment.) Comdisco recovers a portion of the equity portion by entering into sale-leaseback transactions with third parties.

In a sale-leaseback transaction, the third party purchases the equipment (subject to the existing lease and existing lien) and leases it back to Comdisco. Generally, the present value of rent paid by Comdisco to the third party is less than the purchase price paid by the third party. The third party obtains the depreciation deductions associated with the equipment and is entitled to the residual value of the equipment at the end of the lease. Ideally, the transaction is structured so that the third party can recover most of his investment from the residual value and profits from the tax savings he receives from depreciation and interest deductions. Comdisco also obtains a tax benefit from the transaction; the sale-leaseback transaction allows Comdisco a deduction for the rent it pays to the third party (instead of a deduction for depreciation of

the equipment), thereby reducing Comdisco's alternative minimum tax.

Between 1993 and 1996, Comdisco had a wholly owned subsidiary, Comdisco Investment Group, Inc. (CIG). CIG's executives included: Frank Trznadel--president; Robert Snyder--executive vice president; and Paula Ortmann–vice president.

CIG assisted Comdisco in structuring sale-leaseback transactions of computers involving foreign investors and U.S. corporations (domestic corporations), referred to by Comdisco as cross-border equipment leasing transactions. CIG presented to domestic corporations proposals for cross-border equipment leasing transactions between Comdisco, partnerships made up of the foreign investors, and the domestic corporations.[2] The proposals stated in relevant part:

COMDISCO EQUIPMENT LEASING CONCEPT

Comdisco has developed a cross-border equipment leasing transaction that produces permanent U.S. tax savings through the advantageous use of U.S. tax rules concerning the acceleration of taxable income from rents.

Unlike most Western countries, the United States treats as taxable income any amounts received as prepaid rent or as proceeds from a sale, without recourse, of a stream of rental payments. These amounts are income even though they are unearned and are attributable to future years.

---

[2] Comdisco had entered into transactions similar to the transaction at issue in these cases. Prior transactions involved the participation of the following four partnerships: Fillupar Leasing (1991); Astropar Leasing (1991); Compupar Leasing (I) (1992); and Compupar Leasing (II) (1992).

As will be shown below, the unusual U.S. treatment of these income amounts creates an opportunity for an "arbitrage" between the U.S. tax system and that of another country (such as Belgium) which does not treat the amounts as currently taxable income.

The essential elements of the transaction are as follows:

1.    Two Belgian individuals, with experience in all aspects of the leasing business, purchase a portfolio of U.S. computer equipment from Comdisco, Inc. ("Comdisco"). The purchase is made through an entity that is treated as a partnership for U.S. tax purposes (the "Partnership"). The equipment is immediately leased back to Comdisco, which in turn subleases the equipment to its customers, the users of the equipment.  Neither the Partnership nor its partners are subject to U.S. tax.

2.    Subsequently, the Partnership sells to a bank the right to receive the rents payable by Comdisco under the lease.  The sale of the Comdisco rent stream is without recourse to either the Partnership or to the equipment.  Accordingly, from a U.S. point of view, all of the rental income from the Comdisco lease is deemed to have been accelerated.  Stated another way, the sale of the rent stream removes or "strips" the rental income from the leased equipment.

3.    At a later date, but without any prior commitment (formal or informal) to do so, a U.S. company may acquire a 98% interest in the Partnership, utilizing certain provisions of the U.S. tax code under which tax attributes carry over to the new owner.

4.    The U.S. company, as 98% partner, would be entitled to depreciation with respect to 98% of the cost of the equipment.  No rental income would be reportable by the U.S. company, that income having been accelerated into the tax period prior to the U.S. company's becoming a partner.

5.    The resulting U.S. tax savings from the depreciation would be permanent tax savings, not mere deferrals.  They would be reflected in reported earnings.

The law firm of Baker & McKenzie provided Comdisco with legal

services related to the sale-leaseback transactions.

III. Negotiations

    A.    CIG's Initial Discussions With Norwest and NEFI

In June 1993, representatives from CIG (Mr. Trznadel, Mr. Snyder, and Ms. Ortmann), Norwest (Mr. Vandermark), NEFI (Ms. Grossman), and Peat Marwick met to discuss a cross-border equipment leasing transaction involving a portfolio of IBM computer equipment (ultimately, the sale-leaseback transaction involved herein). At this meeting, representatives of CIG made a presentation from a paper (entitled "Equipment Leasing Proposal" (the Proposal)), and various flowcharts that outlined the elements and tax benefits of a proposed cross-border equipment leasing transaction.

Following the June presentation by CIG, Ms. Grossman requested additional information from Comdisco. On July 6, 1993, Ms. Ortmann sent Ms. Grossman an economic analysis of a hypothetical sale-leaseback transaction involving a $75 million portfolio of computer equipment.[3] On August 3, 1993, Ms. Ortmann provided Ms. Grossman with sample documents (including a contract for sale of equipment, lease, notes, security agreements, and a contract for sale of the lease receivable) which could be used in connection with a proposed cross-border equipment leasing transaction. Ms. Grossman gave these documents to NEFI's attorneys for their review. Ms. Grossman also requested, by interoffice memo, that the articles of

---

    [3]    The economic analysis of a $75 million portfolio shows a cash investment by the 98-percent shareholder of $9,252,693 and a pretax profit of 6.1 percent using an estimated residual value on the lease termination date of $22,754,717.

incorporation of a then-dormant corporation, known as Radio Dealers Leasing, Inc.,[4] be amended so as to change the name of the corporation to RD Leasing, Inc. (RD Leasing).[5] RD Leasing was to become the U.S. company involved in the sale-leaseback transaction which is the subject of this litigation.

On August 6, 1993, Ms. Ortmann provided Ms. Grossman with a portfolio of computers owned by Comdisco valued at $94 million which could be the subject of a cross-border equipment leasing transaction. The equipment Comdisco proposed to sell and simultaneously lease back was subject to existing leases between Comdisco (as lessor) and others (i.e., large corporations and institutions) as end users. The equipment was also subject to existing liens securing nonrecourse loans. Some of the existing leases required the consent of the end user to any sale of the equipment by Comdisco. A draft of a letter to one of the end users, dated August 30, 1993, requested written consent to a sale of the equipment to Norwest Bank Corp. and assured that the "transfers are subject, subordinate to and in no way alter your rights under the Lease. Comdisco remains responsible for all of its obligations as Lessor of the Equipment to the same extent as if the transfers had not occurred." Letters dated September 7, 1993,

---

[4]     Radio Dealers Leasing, Inc., was organized as a corporation under Minnesota law on Apr. 20, 1988.

[5]     NEFI owned all the common stock of RD Leasing during the years in issue and through the dissolution of RD Leasing in 1997.

to two end users requested written consent for a sale to "a bank with a combined capital and surplus of at least $50,000,000". A letter to another end user stated that the sale was to a Wyoming limited liability company. The letters to the end users also stated that Comdisco had the option to repurchase the equipment at the end of the lease and "expect[ed] to do so".

On August 30, 1993, Ms. Grossman faxed CIG Norwest's credit standards for end users of the equipment.[6]

B.    NEFI's Credit Approval Presentation

Mark Valentine, assistant vice president of credit for NEFI, managed a staff of credit analysts and officers. His role in the sale-leaseback transaction involved herein was limited to reviewing Comdisco's creditworthiness and ability to service any acquired portfolio of leased computers.

On September 2, 1993, having received information regarding the proposed sale-leaseback transaction from Ms. Grossman, Mr. Valentine authorized a "Transaction Credit Analysis", referred to within NEFI as a "Credit Approval Presentation" (CAP). The stated purpose of the CAP was to review "Comdisco's ability to service an acquired portfolio and, in the event of a sub-leasee default, replace equipment leases." The CAP emphasized that the risk of the

---

[6]    The creditworthiness of the end user was important because the computers sold (as well as the rents due Comdisco from the end users) had been used by Comdisco as collateral to secure its own loans and were subject to the existing liens. Ms. Grossman, however, did not inquire into the amounts of the existing liens, and that information was not provided to her.

transaction was rated "purely on the credit of Comdisco <u>and not on</u> <u>the risks inherent in this tax advantaged lease transaction</u>".

The CAP stated in relevant part: "All credit and tax risks will be assumed by Norwest Tax Department"; NEFI's role would be "that of consultant"; and NEFI would be paid a fee for its services. The CAP also contained a "Collateral" section, reflecting that "Limited value is placed upon the collateral with the transaction's purpose being tax driven and subject to Norwest Tax Department approval. However, there is upside potential for the benefit of Norwest Corporation." The CAP further stated that "Credit risk is considered remote based upon Comdisco's credit, substantial underlying lessees and short 36 month term."[7]

Because Mr. Vandermark was head of the Norwest tax department, his signature was required on all CAPs involving sale-leaseback transactions. Mr. Vandermark had to verify that Norwest had taxable income sufficient to use the desired tax benefits.

Various Norwest and NEFI officers signed the CAP; the last signature was dated September 21, 1993. The CAP approved

---

[7] According to Mr. Vandermark and Mr. Renner, president of NEFI, all sale-leaseback transactions have substantial tax benefits; the "upside potential" (as referred to in the CAP) was "in the residuals". According to Ms. Grossman, the CAP's reference to "tax driven" meant that there were tax benefits associated with the proposed sale-leaseback transaction and that there was "residual upside", meaning that the residual value of the computers could produce a substantial economic profit.

Comdisco's credit rating but did not commit Norwest, NEFI, or RD Leasing to enter into the sale-leaseback transaction involved herein.

C.    Financial Projections and Appraisals

CIG had a contract with Marshall & Stevens (M&S) pursuant to which M&S agreed to provide appraisal reports for the computer equipment in Comdisco's portfolio. M&S agreed to perform quarterly appraisals for $1,500 per quarter and to submit to CIG reports derived from these quarterly appraisals at $300 per report. M&S sent the reports to James Hastings, a CIG executive. Mr. Hastings prepared financial analyses (including the modeling of the economics of transactions CIG proposed), handled various accounting issues, and worked with appraisers.

When the sale-leaseback transaction involved herein was proposed, Mr. Hastings used the M&S report to interpolate the values stated therein to arrive at values relevant to the specific dates in the proposed transaction. He then presented these interpolated numbers to Greg Barwick, one of M&S's appraisers.[8]

CIG had a letter, dated September 25, 1993, delivered by messenger to Ms. Grossman, as well as Messrs. Beadie and Steffen. That letter included red-lined drafts of the documents for the

---

[8]    Mr. Hastings prepared an equipment schedule with current and projected residual values to verify that the numbers were still "in force as of the date of the transaction in case the transaction date fell between a couple of quarters". Mr. Barwick used Mr. Hastings' equipment schedule to write his appraisal report.

proposed sale-leaseback transaction, as well as a financial analysis (the September Projections), which consisted of economic projections relating to the transaction: one projection was premised upon the assumption that Comdisco would exercise an early termination option,[9] while the other was premised upon the assumption that Comdisco would not. The assumptions as to the residual values were identical to the forecasts set forth in the appraisal of the equipment dated September 28, 1993, provided by M&S.

The following charts set forth the economic projections with respect to the proposed purchasing partnership (charts 1-8) and to the proposed U.S. company partner (charts 9-12):

---

[9] Early termination dates and final termination dates were specified in the documents.

Chart 1

### Computation of Partnership Taxable Income With Estimated Residual Value Proceeds
(Assumes Full Term)

| Year Ending | Sale Rent Receivable | Additional Fixed Rent | Depreciation Deduction | Interest Expense | | | Residual Income | Taxable Income(Loss) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Bank Loan | Install. Note | Balloon Note | | |
| 11/28/93 | $87,793,608 | -0- | -0- | ($106,409) | ($364,289) | ($300,982) | -0- | $87,021,928 |
| 12/31/93 | -0- | -0- | ($6,120,788) | -0- | -0- | (305,514) | -0- | (6,426,302) |
| 12/31/94 | -0- | -0- | (46,517,990) | -0- | -0- | (1,932,141) | -0- | (48,450,131) |
| 12/31/95 | -0- | -0- | (27,910,794) | -0- | -0- | (2,113,390) | -0- | (30,024,183) |
| 12/31/96 | -0- | $19,385,022 | (16,746,476) | -0- | -0- | (2,158,409) | -0- | 480,136 |
| 12/31/97 | -0- | 6,003,302 | (25,119,714) | -0- | -0- | (335,666) | $25,418,982 | 5,966,904 |
| Total | 87,793,608 | 25,388,324 | (122,415,762) | (106,409) | (364,289) | (7,146,103) | 25,418,982 | 8,568,352 |

Chart 2

### Computation of Partnership Cash Flow With Estimated Residual Value Proceeds
(Assumes Full Term)

| Year Ending | Equipment Purchase | Debt Service | | | Sale Rent Receivable | Additional Fixed Rent | Residual Income | Pretax Cash Flow |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Bank Loan | Install. Note | Balloon Note | | | | |
| 11/28/93 | ($122,415,762) | $14,995,931 | ($364,289) | $19,990,512 | $87,793,608 | -0- | -0- | -0- |
| 12/31/93 | -0- | (15,102,340) | -0- | -0- | -0- | -0- | -0- | ($15,102,340) |
| 12/31/94 | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- |
| 12/31/95 | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- |
| 12/31/96 | -0- | -0- | -0- | (4,819,668) | -0- | $19,385,022 | -0- | 14,565,354 |
| 12/31/97 | -0- | 0- | -0- | (22,316,947) | -0- | 6,003,302 | $25,418,982 | 9,105,338 |
| Total | (122,415,762) | (106,409) | (364,289) | (7,146,103) | 87,793,608 | 25,388,324 | 25,418,982 | 8,568,352 |

Chart 3

Computation of Partnership Taxable Income Without Estimated Residual Value Proceeds

(Assumes Full Term)

| Year Ending | Sale Rent Receivable | Additional Fixed Rent | Depreciation Deduction | Interest Expense | | | Balloon Note COD Income | Taxable Income(Loss) |
|---|---|---|---|---|---|---|---|---|
| | | | | Bank Loan | Install. Note | Balloon Note | | |
| 11/28/93 | $87,793,608 | -0- | -0- | ($106,409) | ($364,289) | ($300,982) | -0- | $87,021,928 |
| 12/31/93 | -0- | -0- | ($6,120,788) | -0- | -0- | (305,514) | -0- | (6,426,302) |
| 12/31/94 | -0- | -0- | (46,517,990) | -0- | -0- | (1,932,141) | -0- | (48,450,131) |
| 12/31/95 | -0- | -0- | (27,910,794) | -0- | -0- | (2,113,390) | -0- | (30,024,183) |
| 12/31/96 | -0- | $19,385,022 | (16,746,476) | -0- | -0- | (2,158,409) | -0- | 480,136 |
| 12/31/97 | -0- | 6,003,302 | (25,119,714) | -0- | -0- | (335,666) | $20,335,186 | 883,108 |
| Total | 87,793,608 | 25,388,324 | (122,415,762) | (106,409) | (364,289) | (7,146,103) | 20,335,186 | 3,484,555 |

Chart 4

Computation of Partnership Cash Flow Without Estimated Residual Value Proceeds

(Assumes Full Term)

| Year Ending | Equipment Purchase | Debt Service | | | Sale Rent Receivable | Additional Fixed Rent | Residual Income | Pretax Cash Flow |
|---|---|---|---|---|---|---|---|---|
| | | Bank Loan | Install. Note | Balloon Note | | | | |
| 11/28/93 | ($122,415,762) | $14,995,931 | ($364,289) | $19,990,512 | $87,793,608 | -0- | -0- | -0- |
| 12/31/93 | -0- | (15,102,340) | -0- | -0- | -0- | -0- | -0- | ($15,102,340) |
| 12/31/94 | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- |
| 12/31/95 | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- |
| 12/31/96 | -0- | -0- | -0- | (4,819,668) | -0- | $19,385,022 | -0- | 14,565,354 |
| 12/31/97 | -0- | 0- | -0- | (1,981,761) | -0- | 6,003,302 | -0- | 4,021,541 |
| Total | (122,415,762) | (106,409) | (364,289) | 13,189,083 | 87,793,608 | 25,388,324 | -0- | 3,484,555 |

Chart 5

Computation of Partnership Taxable Income With Estimated Residual Value Proceeds

(Assumes Early Termination)

| Year Ending | Sale Rent Receivable | Depreciation Deduction | Interest Expense | | | Residual & Early Term. Penalty | Taxable Income (Loss) |
|---|---|---|---|---|---|---|---|
| | | | Bank Loan | Install. Note | Balloon Note | | |
| 11/28/93 | $87,793,608 | -0- | ($106,409) | ($364,289) | ($300,982) | -0- | $87,021,928 |
| 12/31/93 | -0- | ($6,120,788) | -0- | -0- | (305,514) | -0- | (6,426,302) |
| 12/31/94 | -0- | (46,517,990) | -0- | -0- | (1,932,141) | -0- | (48,450,131) |
| 12/31/95 | -0- | (27,910,794) | -0- | -0- | (2,113,390) | -0- | (30,024,183) |
| 12/31/96 | -0- | (41,866,191) | -0- | -0- | (940,072) | $44,619,804 | 1,813,541 |
| Total | 87,793,608 | 122,415,762 | (106,409) | (364,289) | (5,592,099) | 44,619,804 | 3,934,853 |

Chart 6

Computation of Partnership Cash Flow With Estimated Residual Value Proceeds

(Assumes Early Termination)

| Year Ending | Equipment Purchase | Debt Service | | | Sale Rent Receivable | Early Term. Penalty | Pretax Cash Flow |
|---|---|---|---|---|---|---|---|
| | | Bank Loan | Install. Note | Balloon Note | | | |
| 11/28/93 | ($122,415,762) | $14,995,931 | ($364,289) | $19,990,512 | $87,793,608 | -0- | -0- |
| 12/31/93 | -0- | (15,102,340) | -0- | -0- | -0- | -0- | ($15,102,340) |
| 12/31/94 | -0- | -0- | -0- | -0- | -0- | -0- | -0- |
| 12/31/95 | -0- | -0- | -0- | -0- | -0- | -0- | -0- |
| 12/31/96 | -0- | -0- | -0- | (25,582,611) | -0- | $44,619,804 | 19,037,193 |
| Total | (122,415,762) | (106,409) | (364,289) | (5,592,099) | 87,793,608 | 44,619,804 | 3,934,853 |

Chart 7

### Computation of Partnership Taxable Income Without Estimated Residual Value Proceeds

(Assumes Early Termination)

| Year Ending | Sale Rent Receivable | Depreciation Deduction | Interest Expense Bank Loan | Interest Expense Install. Note | Interest Expense Balloon Note | Early Term. Penalty | Taxable Income (Loss) |
|---|---|---|---|---|---|---|---|
| 11/28/93 | $87,793,608 | -0- | ($106,409) | ($364,289) | ($300,982) | -0- | $87,021,928 |
| 12/31/93 | -0- | ($6,120,788) | -0- | -0- | (305,514) | -0- | (6,426,302) |
| 12/31/94 | -0- | (46,517,990) | -0- | -0- | (1,932,141) | -0- | (48,450,131) |
| 12/31/95 | -0- | (27,910,794) | -0- | -0- | (2,113,390) | -0- | (30,024,183) |
| 12/31/96 | -0- | (41,866,191) | -0- | -0- | (940,072) | $25,926,467 | (16,879,796) |
| Total | 87,793,608 | 122,415,762 | (106,409) | (364,289) | (5,592,099) | 25,926,467 | (14,758,484) |

Chart 8

### Computation of Partnership Cash Flow Without Estimated Residual Value Proceeds

(Assumes Early Termination)

| Year Ending | Equipment Purchase | Debt Service Bank Loan | Debt Service Install. Note | Debt Service Balloon Note | Sale Rent Receivable | Early Term. Penalty | Pretax Cash Flow |
|---|---|---|---|---|---|---|---|
| 11/28/93 | ($122,415,762) | $14,995,931 | ($364,289) | $19,990,512 | $87,793,608 | -0- | -0- |
| 12/31/93 | -0- | (15,102,340) | -0- | -0- | -0- | -0- | ($15,102,340) |
| 12/31/94 | -0- | -0- | -0- | -0- | -0- | -0- | -0- |
| 12/31/95 | -0- | -0- | -0- | -0- | -0- | -0- | -0- |
| 12/31/96 | -0- | -0- | -0- | (25,582,611) | -0- | $25,926,467 | 343,856 |
| Total | (122,415,762) | (106,409) | (364,289) | (5,592,099) | 87,793,608 | 25,926,467 | (14,758,484) |

Chart 9

Computation of U.S. Company Taxable Income, Tax Savings, and Cash Flow With Estimated Residual Value Proceeds

(Assumes Full Term)

| | Taxable Income | | | | Cash Flow | | |
|---|---|---|---|---|---|---|---|
| Year | From | Taxes | Share of Partnership | Preferred Stock Dividend/ | Pre-Tax | Taxes | After-Tax |
| Ending | Partnership | (Paid) Saved | Cash Flow | Redemption | Cash Flow | (Paid) Saved | Cash Flow |
| 12/31/93 | ($6,297,776) | $2,376,151 | ($14,800,293) | -0- | ($14,800,293) | $2,376,151 | ($12,424,142) |
| 12/31/94 | (47,481,128) | 17,914,630 | -0- | ($48,966) | (48,966) | 17,914,630 | 17,865,663 |
| 12/31/95 | (29,423,700) | 11,101,562 | -0- | (48,966) | (48,966) | 11,101,562 | 11,052,596 |
| 12/31/96 | 470,533 | (177,532) | 14,274,047 | (48,966) | 14,225,081 | (177,532) | 14,047,549 |
| 12/31/97 | 5,847,566 | (2,206,287) | 8,923,231 | (48,966) | 8,874,265 | (2,206,287) | 6,667,978 |
| 12/31/98 | -0- | -0- | -0- | (661,045) | (661,045) | -0- | (661,045) |
| Total | (76,884,505) | 29,008,524 | 8,396,985 | (856,910) | 7,540,074 | 29,008,524 | 36,548,598 |


Chart 10

Computation of U.S. Company Taxable Income, Tax Savings, and Cash Flow Without Estimated Residual Value Proceeds

(Assumes Full Term)

| | Taxable Income | | | | Cash Flow | | |
|---|---|---|---|---|---|---|---|
| Year | From | Taxes | Share of Partnership | Preferred Stock Dividend/ | Pre-Tax | Taxes | After-Tax |
| Ending | Partnership | (Paid) Saved | Cash Flow | Redemption | Cash Flow | (Paid) Saved | Cash Flow |
| 12/31/93 | ($6,297,776) | $2,376,151 | ($14,800,293) | -0- | ($14,800,293) | $2,376,151 | ($12,424,142) |
| 12/31/94 | (47,481,128) | 17,914,630 | -0- | ($48,966) | (48,966) | 17,914,630 | 17,865,663 |
| 12/31/95 | (29,423,700) | 11,101,562 | -0- | (48,966) | (48,966) | 11,101,562 | 11,052,596 |
| 12/31/96 | 470,533 | (177,532) | 14,274,047 | (48,966) | 14,225,081 | (177,532) | 14,047,549 |
| 12/31/97 | 865,445 | (326,533) | 3,941,110 | (48,966) | 3,892,144 | (326,533) | 3,565,611 |
| 12/31/98 | -0- | -0- | -0- | (661,045) | (661,045) | -0- | (661,045) |
| Total | (81,866,625) | 30,888,278 | 3,414,864 | (856,910) | 2,557,954 | 30,888,278 | 33,446,232 |

Chart 11

Computation of U.S. Company Taxable Income, Tax Savings, and Cash Flow With Estimated Residual Value Proceeds

(Assumes Early Termination)

| Year Ending | Taxable Income From Partnership | Taxes (Paid) Saved | Cash Flow Share of Partnership Cash Flow | Preferred Stock Dividend/ Redemption | Pre-Tax Cash Flow | Taxes (Paid) Saved | After-Tax Cash Flow |
|---|---|---|---|---|---|---|---|
| 12/31/93 | ($6,297,776) | $2,376,151 | ($14,800,293) | -0- | ($14,800,293) | $2,376,151 | ($12,424,142) |
| 12/31/94 | (47,481,128) | 17,914,630 | -0- | ($48,966) | (48,966) | 17,914,630 | 17,865,663 |
| 12/31/95 | (29,423,700) | 11,101,562 | -0- | (48,966) | (48,966) | 11,101,562 | 11,052,596 |
| 12/31/96 | 1,440,292 | (543,422) | 18,319,471 | (48,966) | 18,270,504 | (543,422) | 17,727,082 |
| 12/31/97 | -0- | -0- | -0- | (48,966) | (48,966) | -0- | (48,966) |
| 12/31/98 | -0- | -0- | -0- | (661,045) | (661,045) | -0- | (661,045) |
| Total | (81,762,312) | 30,848,920 | 3,519,177 | (856,910) | 2,662,267 | 30,848,920 | 33,511,187 |

Chart 12

Computation of U.S. Company Taxable Income, Tax Savings, and Cash Flow Without Estimated Residual Value Proceeds

(Assumes Early Termination)

| Year Ending | Taxable Income From Partnership | Taxes (Paid) Saved | Cash Flow Share of Partnership Cash Flow | Preferred Stock Dividend/ Redemption | Pre-Tax Cash Flow | Taxes (Paid) Saved | After-Tax Cash Flow |
|---|---|---|---|---|---|---|---|
| 12/31/93 | ($6,297,776) | $2,376,151 | ($14,800,293) | -0- | ($14,800,293) | $2,376,151 | ($12,424,142) |
| 12/31/94 | (47,481,128) | 17,914,630 | -0- | ($48,966) | (48,966) | 17,914,630 | 17,865,663 |
| 12/31/95 | (29,423,700) | 11,101,562 | -0- | (48,966) | (48,966) | 11,101,562 | 11,052,596 |
| 12/31/96 | (16,879,179) | 6,368,514 | -0- | (48,966) | (48,966) | 6,368,514 | 6,319,548 |
| 12/31/97 | -0- | -0- | -0- | (48,966) | (48,966) | -0- | (48,966) |
| 12/31/98 | -0- | -0- | -0- | (661,045) | (661,045) | -0- | (661,045) |
| Total | (100,081,783) | 37,760,857 | (14,800,293) | (856,910) | (15,657,204) | 37,760,857 | 22,103,653 |

Ms. Grossman reviewed the September Projections. The September Projections specifically forecasted that: (1) If Comdisco exercised an early termination option under the lease, the partnership would get a pretax return of 9.0 percent, and RD Leasing would get a pretax return of 6.6 percent and an after-tax return of 101.5 percent; and (2) if Comdisco exercised a final termination option under the lease, the partnership would get a pretax return of 15.1 percent, and RD Leasing would get a pretax return of 14.0 percent and an after-tax return of 99.5 percent.

A copy of the M&S appraisal report dated September 28, 1993, was given to Ms. Grossman. CIG provided two additional appraisal reports, also dated September 28, 1993, one from Manufacturers' Appraisal Co. (MAC) and the other from Appraisal Resources International (ARI).

CIG paid for the M&S, MAC, and ARI appraisals.[10] Ms. Grossman was aware that the residual value forecasts of the IBM mainframe computers in the M&S, MAC, and ARI appraisal reports were higher than those of industry publishers, such as Daley Marketing Corp. (DMC), International Data Corp. (IDC), and the Gartner Group. On the basis of her own experience, Ms. Grossman believed that forecasts of IDC and the Gartner Group tended to be overly conservative.

---

[10] According to Ms. Grossman, Ms. Ortmann, Mr. Renner, and petitioners' expert Thompson Ryan, it is common for the packager of a leasing transaction (here, CIG) to pay the appraisal fees.

The following reflects the projected residual values of the equipment at the early and final termination dates, as set forth in the M&S, MAC, and ARI appraisal reports:

|  | M&S | MAC | ARI |
|---|---|---|---|
| Early termination | $44,275,948 | $48,442,600 | $45,334,670 |
| Final termination | 25,418,982 | 34,257,000 | 26,769,965 |

Ms. Grossman provided copies of the three appraisal reports to NEFI's attorneys, Messrs. Beadie and Steffen.

Ms. Grossman discussed the proposed returns of the transaction with Mr. Vandermark, who in turn discussed them with Mr. Thornton (Norwest's chief financial officer). Mr. Thornton subsequently approved the transaction.

D.   The Foreign Investors

As outlined in the materials provided to Norwest in June 1993, CIG had discussions with potential Swiss investors, Hans Humbel and Egon Riesterer, regarding the possibility of their involvement in a sale-leaseback transaction. Messrs. Humbel and Riesterer proposed to form an entity called Intared for this purpose. On September 14, 1993, Comdisco sent Ms. Grossman and Faegre & Benson copies of "Articles of Organization for Intared I, Limited Liability Company". Comdisco's negotiations with Messrs. Humbel and Riesterer, however, terminated in September 1993 because Comdisco was unwilling to sign the tax indemnity agreement they had proposed. Immediately thereafter, CIG sought other foreign investors to complete the transaction.

Richard Temko is an American attorney with an office in Brussels, Belgium. CIG's executive vice president (Mr. Snyder) was acquainted with Mr. Temko. Baudouin Parmentier and Frederic de la Barre d'Erquelinnes are citizens and residents of Belgium.[11] Mr. Temko introduced Mr. Parmentier to Mr. Snyder, and Mr. Parmentier engaged Mr. Temko as his legal adviser to represent him in the transactions at issue in this case.

On September 15, 1993, Mr. Snyder sent a memorandum (by facsimile) to Mr. Temko describing a possible cross-border equipment leasing transaction, along with flowcharts, in which Mr. Parmentier would exchange an interest in a limited liability company (ultimately, Andantech) for preferred stock to be issued by a "U.S. Company" (ultimately, the preferred stock of RD Leasing). The next day, although negotiations were ongoing with NEFI, Mr. Snyder sent a second memorandum and summary sheet to Mr. Temko, which stated that "No U.S. company has made any commitment to enter into the exchange * * * and there can be no assurance any such U.S.

---

[11] Neither Mr. Parmentier nor Mr. de la Barre d'Erquelinnes was subject to our jurisdiction, and neither appeared at trial. However, Mr. Parmentier agreed to be deposed on May 4, 2000 (and to be interviewed on May 5, 2000), in Brussels. The parties stipulated that had Mr. Parmentier testified at trial, his testimony would be as set forth in the transcript (including exhibits) of his May 4, 2000, deposition, and the transcript (including exhibits) of his May 5, 2000, interview.

We have examined the transcripts of Mr. Parmentier's deposition and interview and find many of his statements are unsupported by other evidence in the record.

Mr. de la Barre d'Erquelinnes was neither deposed nor interviewed.

company will be found." Mr. Parmentier was interested in participating in the transaction but was concerned about his potential tax liability, as well as the financial risk.

On September 17, 1993, Mr. Temko sent a letter (by facsimile) from Mr. Parmentier to Comdisco "confirming the terms upon which he and his co-investor are prepared to participate in the proposed transaction." Mr. Temko requested that Comdisco countersign the letter. Mr. Parmentier's conditions included assurances from Comdisco that if the transaction did not proceed as reflected in the flowcharts, then Mr. Parmentier and his partner could (1) promptly recover their $200,000 investment, (2) withdraw from Andantech at no expense, (3) incur no potential liability for Andantech debts, and (4) incur no potential liability in connection with managing Andantech. Further, Mr. Parmentier asked Comdisco to provide assurances that he would be able to exchange his interest for preferred stock on the basis described in the flowcharts and realize the full value of the preferred stock "without any significant risk of impairment". Mr. Snyder advised Mr. Parmentier that Comdisco could not make the requested assurances. However, by letter dated September 24, 1993, Mr. Snyder confirmed to Mr. Parmentier:

> there will be no impediment to the sale of the preferred shares at any time such a sale should be desired. (It would be appreciated, from a tax point of view, if no sale were arranged for one year, but no such legal restriction would exist.)

Let me also confirm that, if the U.S. Company

defaulted on dividends (or redemption), the preferred shareholder(s) would take over voting control of U.S. Company. This, in turn, would trigger the "excess loss account" of U.S. Company (that is, the excess of tax losses previously claimed from this transaction over the parent company's investment in the U.S. Company) as immediate taxable income of the parent. (This would be a disaster since it plans to never have to trigger the excess loss account). * * *

On September 25, 1993, Barbara Spudis with Baker & McKenzie faxed to the firm's Amsterdam office an urgent request for answers to questions posed by Mr. Temko. The fax stated in part:

> The client [Comdisco] is planning to close the transaction involving the LLC on Tuesday, September 28, 1993. At the last minute, the two original investors (Swiss individuals) in the transaction appear to have backed out, and now the client is attempting to replace them with two Belgian individuals. In order to do so, we are attempting to describe the entire transaction and satisfy their counsel as to the minimal risks associated with the transaction on a rush basis. * * *
>
>       *    *    *    *    *    *    *
>
> To give you more information about the transaction I am attaching a description of the facts which was prepared when Swiss involvement was contemplated. * * * The entire transaction is expected to involve approximately $120 million. Basically, the individuals forming the company are involved for two months during which the income allocation occurs and then the interest is transferred to the U.S. corporate investor who reaps the benefit of ongoing depreciation deductions.

IV. Formation of Andantech and the Sale-Leaseback (Appendixes A, B, and C)

Andantech's articles of organization were signed on September 25, 1993, by Ms. Spudis and Regina Howell, also of the Baker & McKenzie law firm, and the certificate of organization was issued by the Wyoming secretary of state on September 27, 1993.

On September 27, 1993, Mr. Snyder, Ms. Ortmann, and Mr. Trznadel flew to Minneapolis to meet with Messrs. Beadie and Steffen (NEFI's attorneys) to discuss the "red-lined drafts" of the documents. During the meeting, Messrs. Beadie and Steffen provided CIG with their changes to the drafts.

On September 27, 1993, Mr. Parmentier contributed $196,000 to the capital of Andantech (Mr. Parmentier borrowed the entire amount from Banque Internationale de Luxembourg), and Mr. de la Barre d'Erquelinnes contributed $4,000 to the capital of Andantech (the source of funds for Mr. de la Barre d'Erquelinnes's capital contribution is not reflected in the record). Andantech retained N.V.O. Computerleasing B.V. (NVO), a Dutch corporation directed by Nicholas van Onselen, as its first manager.[12] A Dutch corporation was chosen to avoid conducting any business activity in the United States or Belgium.

The operating agreement of Andantech, dated September 28, 1993, provided for a priority return for Mr. de la Barre d'Erquelinnes (or his successor in interest). Specifically, the agreement provided that if, at the time of a distribution from the partnership, Mr. de la Barre d'Erquelinnes had made capital contribution other than his initial capital contribution of $4,000, then distributions were to be made first to him in an amount equal to his priority return (6 percent of his unreturned capital

---

[12] In subsequent years, its managers were James Fetzer and Andrew Rupprecht, NEFI employees.

compounded monthly) plus his unreturned capital. Distributions would then be made to Mr. Parmentier to the extent of his unreturned capital. Any remaining amount would be distributed among the members in proportion to their percentage interests.

Mr. Snyder did not disclose the identity of the foreign investors to Ms. Grossman or to other NEFI representatives, nor did he disclose the identity of the U.S. company to Mr. Parmentier. In October or November 1993, Ms. Grossman learned that Mr. Parmentier was a partner in Andantech; in November 1993, Messrs. Steffen and Beadie learned Mr. Parmentier's identity.

On September 28, 1993, Andantech and Comdisco executed an "Equipment Purchase Agreement" (the purchase agreement), an "Equipment Lease" (the equipment lease), and other documents, which memorialized the sale-leaseback of 40 IBM mainframe computers (the equipment) then owned by Comdisco. At the time the purchase agreement was executed, the equipment was under lease to various end users. Pursuant to the purchase agreement, the equipment was sold subject to the user leases and liens in favor of different Comdisco lenders.

A.   The Purchase Price

The purchase price for the equipment was $122,415,762; the purchase price was paid: (1) $14,995,931 in cash, which Union Bank of Switzerland (UBS) lent to Andantech (the bank loan); and (2) the $107,419,831 balance, by Andantech's notes, consisting of (i) a series of nine junior nonrecourse balloon notes (junior promissory

notes 2a-2i, referred to as the balloon notes) aggregating $19,990,512[13] (the balloon notes, documenting the balloon loan), and (ii) a junior recourse note in the amount of $87,429,319[14] (the term note, documenting the term loan). The bank loan, the balloon loan, and the term loan all were tied to the equipment lease.

B. The Equipment Lease

Immediately after purchasing the equipment, Andantech leased such equipment to Comdisco pursuant to the equipment lease; this was a net lease. The equipment consisted of 40 IBM mainframe computers and associated ancillary equipment. There were nine different models--four were IBM 9121s and five were IBM 9021s (the IBM 9021s were larger and more powerful than the IBM 9121s). The equipment lease separated the equipment into nine categories (A through I) by model type. Equipment in categories A through D included the IBM 9121s and equipment in categories E through I included the IBM 9021s. The term of the equipment lease varied from 41 to 47 months, depending upon the category of equipment.

During the term of the lease, Comdisco could, at its expense, add or install upgrades on the equipment. Any upgrade did not

---

[13] Interest accrued on the principal at 9 percent per annum, compounded monthly. Accrued interest was payable at maturity.

[14] Principal and interest were payable in monthly installments equal to the monthly rent due from Comdisco before the early termination date under the lease. Interest was payable on the principal at 5 percent per annum, compounded monthly, subject to any increase in rent as provided in the lease.

become an accession to the equipment and did not become the property of Andantech.

Comdisco had an option (the final termination option) to purchase the equipment at the end of the term of the equipment lease at market value (as defined in the equipment lease). If Comdisco installed any upgrades and did not exercise the final termination option, Comdisco was required to either remove the upgrade or consent to Andantech's sale or re-lease of the equipment with the upgrade. If, after termination of the lease, the equipment with one or more upgrades was sold or re-leased to a party other than Comdisco, Andantech would receive the portion of the proceeds determined by multiplying the amount of the proceeds by a fraction, the numerator of which would be the fair market value of the equipment without the upgrades as of the date of the sale or re-lease and the denominator of which would be the fair market value of the equipment with the upgrades as of such date.

Comdisco was limited in its ability to selectively exercise the final termination option. If Comdisco elected to exercise the final termination option for any of the equipment in categories A through D, it had to do so for all equipment in those categories. Similarly, if Comdisco elected to exercise the final termination option for any of the equipment in categories E through I, it had to do so for all equipment in those categories.

Comdisco also had an option (the early termination option) to terminate the equipment lease with respect to each category of

equipment (and to purchase the equipment) on certain early termination dates by paying to Andantech an amount equal to an "early termination supplement" specified in the equipment lease for that category of equipment plus the greater of (i) the then value of the equipment in that category or (ii) the principal and accrued interest on the balloon note for that category. The early termination option was limited in a manner identical to the final termination option; i.e., if Comdisco elected to exercise the early termination option for any of the equipment in categories A through D, it had to do so for all such equipment. Similarly, if Comdisco elected to exercise the early termination option for any of the equipment in categories E through I, it had to do so for all such equipment.

Comdisco's early termination option was subject to a further restriction in that, unless the UBS bank loan (secured in part by the rent due after the early termination date) was prepaid, Comdisco could not exercise the early termination option without Andantech's approval. The purchase price, termination date, early termination date, early termination stated value, and early termination supplement of the equipment by category were as follows:

Computation of Fair Market Value Sales Price and Early Termination Values & Supplements

| Type/Model/ Category | List (LP) | FMV % of LP | Sale (SP) | Lease Date | Mos. | Date | Early Termination Stated Value % of SP | Amount | % of SP | Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 9021/720/E | $35,412,247 | 18% | $6,374,205 | 2/27/97 | 41 | 5/27/96 | 21.59% | $1,376,191 | 0.28% | $17,848 |
| 9021/740/F | 12,336,045 | 36 | 4,440,976 | 2/27/97 | 41 | 5/27/96 | 20.00 | 888,195 | 0.28 | 12,435 |
| 9021/820/G | 68,624,690 | 36 | 24,704,888 | 2/27/97 | 41 | 5/27/96 | 20.00 | 4,940,978 | 0.28 | 69,174 |
| 9021/860/H | 40,808,478 | 36 | 14,691,052 | 2/27/97 | 41 | 5/27/96 | 20.00 | 2,938,210 | 0.28 | 41,135 |
| 9021/900/I | 139,926,914 | 36 | 50,373,689 | 2/27/97 | 41 | 5/27/96 | 20.00 | 10,074,738 | 0.28 | 141,046 |
| Total 9021 | 297,108,375 | | 100,584,810 | | | | | 20,218,312 | | 281,638 |
| | | | | | | | | | | |
| 9121/260/A | 4,637,115 | 53 | 2,457,672 | 7/27/97 | 46 | 9/27/96 | 23.23 | 570,917 | 0.28 | 6,881 |
| 9121/320/B | 18,186,545 | 49 | 8,911,407 | 8/27/97 | 47 | 10/27/96 | 24.72 | 2,202,900 | 0.29 | 25,843 |
| 9121/440/C | 6,923,363 | 49 | 3,392,448 | 8/27/97 | 47 | 10/27/96 | 24.72 | 838,613 | 0.29 | 9,838 |
| 9121/480/D | 14,427,399 | 49 | 7,069,425 | 8/27/97 | 47 | 10/27/96 | 24.72 | 1,747,562 | 0.29 | 20,501 |
| Total 9121 | 44,174,422 | | 21,830,952 | | | | | 5,359,992 | | 63,063 |
| Total all models | 341,282,796 | | 122,415,762 | | | | | $25,578,304 | | 344,701 |

Rents payable under the equipment lease before the early termination dates were subject to periodic adjustments to the extent that prevailing market rates during the equipment lease term increased or decreased from time to time above or below the rates that were reflected in the original rent schedule. Comdisco had the right, on any rent payment date that occurred more than 5 months after the commencement of the equipment lease, to prepay (on a present value basis) certain of the then-remaining installments of rent.

Pursuant to the terms of the equipment lease and the term loan, for each category of the equipment, rents due to Andantech from Comdisco were equal to the payments under the term loan due from Andantech to Comdisco before the early termination date.

The leases with the end users were unaffected by the equipment lease. When the initial subleases with the end users expired, Comdisco had the right to re-lease the equipment.

Comdisco agreed to indemnify Andantech from and against certain taxes imposed on Andantech (or its members) as a result of the sale, purchase, or ownership of the equipment, the payment of rents, and other factors. The indemnified taxes included State sales and property taxes but did not include any Federal taxes.

Comdisco also agreed to indemnify Andantech against Federal withholding taxes on rents or on income from the sale of any right to receive rents; the indemnity was transferable to the benefit of any purchaser, lender, or other assignee of Andantech.

Additionally, Comdisco agreed to indemnify Messrs. Parmentier and de la Barre d'Erquelinnes from Federal income taxes with respect to the rents, proceeds from the sales of rents, or proceeds from the sale of the equipment, provided (1) they did not engage in any activities in the United States, and (2) Andantech, Mr. Parmentier, and Mr. de la Barre d'Erquelinnes did not maintain a permanent establishment in the United States.

Comdisco had the right to substitute a replacement computer (replacement equipment) for a leased computer, but only if the sublease (to an end user) of the computer terminated and a person unrelated to Comdisco (such as an end user) made a bona fide offer to purchase the computer. In that event, Andantech (as lessor) had the right to request reasonable documentation from Comdisco before transferring title pursuant to a bill of sale. If the replacement equipment did not have the same model number as the leased computer, then the replacement equipment had to have a then value and an estimated residual value (supported by appraisals provided by Comdisco), as well as a remaining useful life, at least as great as those of the substituted computer.

C. <u>The Bank Loan</u>

UBS made a $14,995,931 bank loan to Andantech for the cash portion of the purchase price. Denis Campbell, the account manager at UBS who managed Comdisco's account, worked on the bank loan. UBS had been the lender in four prior Comdisco leveraged sale-leaseback transactions, and Mr. Campbell had worked on all of those

loans.

Initially, the transaction which is the subject of this litigation was to involve Intared I (the entity formed by potential Swiss investors Hans Humbel and Egon Riesterer). As of September 23, 1993, Mr. Campbell was evaluating the transaction with Intared I. By September 25, 1993, however, the Swiss investors had pulled out of the deal, and thereafter, Andantech, with Mr. Parmentier as the member holding the largest interest, was to be the borrower. On September 28, 1993 (at the time the leveraged sale-leaseback transaction was scheduled to close), a UBS loan officer in New York (David Bawden) refused to approve the loan to Andantech.[15] Mr. Bawden requested references as to Mr. Parmentier's character. Mr. Campbell then contacted UBS's leasing affiliate in Switzerland, which vouched for Mr. Parmentier's character. On September 30, 1993, UBS made the bank loan by wire transferring $14,995,931 to Comdisco on Andantech's behalf in payment of the purchase price of the equipment.

The bank loan was for a term of 47 months; however, the Bank Note contained a mandatory payment acceleration clause in the event 3 percent or more of the ownership interest in Andantech was transferred. UBS anticipated that the bank loan would be repaid within 3 months, inasmuch as previous loans made in similar

---

[15] UBS wired $14,995,931 to Comdisco on Sept. 28, 1993, but the same amount was wired back from Comdisco to UBS on the same day.

Comdisco transactions had been prepaid in that timeframe.

V.    Sale of Comdisco Rents (Appendix D)

On September 29, 1993, and October 13, 1993, Ms. Ortmann sent Mr. Beadie drafts of a "corrected lease receivable purchase agreement". Mr. Beadie reviewed and made handwritten notations on these drafts.

Michael Zehfuss is the manager for NationsBank in charge of Comdisco's account. In October 1993, he began working on the transaction in which NationsBank was to purchase a portion of the rents payable under the lease by Comdisco to Andantech.

NationsBank had established a credit limit (i.e., a limitation on the extension of credit) of $125 million for Comdisco. The proposed purchase of rents would have placed NationsBank's exposure (without considering demand deposit overdrafts) at $138 million. Consequently, the transaction required the approval of numerous NationsBank officers. Because of logistical problems, final approval for the transaction was not given until October 27, 1993.

NationsBank's records show that the bank treated the transaction as a loan to Comdisco and anticipated prepayment by March 28, 1994. The bank's records describe the transaction as follows:

> Comdisco has approached NationsBank to provide financing for a sale/leaseback transaction involving a lease receivable purchase with Comdisco as the obligor. The proposed structure is identical to two lease receivable purchases the Bank funded for Comdisco in September 1991 ($10MM related to Astropar L.P) and May 1992 ($35MM related to Compupar L.P.). Each of these transactions *

* * generated $168,000 in net interest income for assuming a short-term, unsecured credit position with Comdisco * * *.

*    *    *    *    *    *    *

Although Comdisco has historically prepaid each receivable purchase transaction that NationsBank has funded, the company may elect not to prepay the proposed purchase. In this situation, NationsBank would hold a 36 month, unsecured loan to Comdisco at 75bp. In electing not to prepay, Comdisco would reduce its ability to fund future transactions in the bank market.

*    *    *    *    *    *    *

Based on the credit quality of Comdisco * * * , the adequate yield * * *, and prepayment history we have experienced in identical transactions, I recommend approval of the $88MM TML. * * *

On October 29, 1993, NationsBank purchased from Andantech (on a nonrecourse basis) a portion of the rents due from Comdisco under the equipment lease for $87,805,802, pursuant to the lease receivable purchase agreement. Pursuant thereto, NationsBank received "designated rights" that included the right to receive the rents but not the equipment.

The rents purchased by NationsBank (aggregating $94,109,445) were those payable pursuant to the equipment lease after October 29, 1993, and before the early termination dates. Pursuant to a Consent and Agreement, Comdisco agreed to make payment of the rents to NationsBank.

Under the terms of the term note for the purchase of the equipment, Andantech's sale of the rents to NationsBank accelerated the term note. Andantech directed NationsBank to wire transfer the

proceeds for the rent sale ($87,805,802) to Comdisco in payment of Andantech's obligations to Comdisco under the term note. NationsBank did so, and Comdisco canceled the term note.

VI. Mr. de la Barre d'Erquelinnes's and Mr. Parmentier's Withdrawal From Andantech

A. Mr. de la Barre d'Erquelinnes's and Mr. Parmentier's Withdrawal of Capital Contributed to Andantech

On November 30, 1993, Mr. Parmentier and Mr. de la Barre d'Erquelinnes withdrew (in the aggregate) $189,882.89 from the capital of Andantech.

B. Transfer of Mr. de la Barre d'Erquelinnes's Membership Interest in Andantech to EICI (Appendix E)

Equipment Investors Co., Inc. (EICI), was organized on December 6, 1993, and at all relevant times thereafter validly existed as a corporation, under the laws of Delaware. Initially, Mr. de la Barre d'Erquelinnes was EICI's sole shareholder; Mr. Parmentier was EICI's sole director.

Pursuant to an Assignment and Assumption of Membership Interest of Andantech L.L.C., dated December 9, 1993, Mr. de la Barre d'Erquelinnes transferred his 2-percent membership interest in Andantech to EICI. Mr. de la Barre d'Erquelinnes thereafter withdrew as a member of Andantech, and EICI was admitted.

On December 28, 1993, Mr. de la Barre d'Erquelinnes transferred his EICI stock to a charitable support trust (the Trust); thereafter, the Trust was at all relevant times the sole shareholder of EICI. The Trust was established in 1988 by

Comdisco, as settlor, and by Robert Kelman, as sole trustee.  The beneficiaries of the Trust were various charitable organizations, and the Trust was a tax-exempt organization.

C.    Transfer of Mr. Parmentier's Membership Interest to RD Leasing in Exchange for Preferred Stock (Appendix F)

Mr. Parmentier transferred his 98-percent membership interest in Andantech to RD Leasing pursuant to an Exchange Agreement dated December 10, 1993.  RD Leasing issued 6,150 shares of series A preferred stock (the RD Leasing preferred stock) to Mr. Parmentier in exchange for his 98-percent membership interest.  Mr. Parmentier thereafter withdrew as a member of Andantech, and RD Leasing was admitted.

The RD Leasing preferred stock provided for a dividend at the rate of 6.878 percent.  The 6,150 shares of RD Leasing preferred stock issued to Mr. Parmentier had a liquidation preference of $615,000 (plus unpaid dividends).  The 6,150 shares of preferred stock had a value of 0.5 percent of the equipment's purchase price (approximately $122 million).

Mr. Parmentier agreed to hold the RD Leasing preferred stock for 1 year (i.e., through December 10, 1994).  RD Leasing, however, was required to maintain a portion of its assets in "permitted investments" (low-risk securities) sufficient to satisfy the liquidation preference, including all accrued but unpaid dividends. RD Leasing had the option to redeem the RD Leasing preferred stock on or after January 1, 2000, at a price equal to the liquidation

preference (plus unpaid dividends), provided that RD Leasing had funds legally available for payment. The holder of the RD Leasing preferred stock had the option to require RD Leasing to redeem the RD Leasing preferred stock on or after January 1, 1999, at a price equal to the liquidation preference (plus unpaid dividends), provided RD Leasing had funds legally available for payment.

The holder of the RD Leasing preferred stock did not have voting rights, except upon the occurrence of certain specified voting rights events, as defined in the terms of the RD Leasing preferred stock. Such events included the failure to make the required redemption of the RD Leasing Preferred Stock and the failure to maintain investment assets at specified levels. Upon the occurrence of such an event, the holder of the RD Leasing preferred stock would have a right, voting with the common stock, to cast in the aggregate 21 percent of the total votes cast by all stockholders.

VII. Repayment of Bank Loan (Appendixes F and G)

Mr. Parmentier's transfer of his 98-percent membership interest in Andantech on December 10, 1993, triggered a mandatory acceleration of the bank loan.

UBS informed Andantech that the payoff amount on the bank loan was $15,119,777.60 and requested that this amount be wired on December 10, 1993, to the account of UBS at the Federal Reserve Bank in New York.

Andantech received the cash needed to repay the bank loan from

capital contributions made by RD Leasing and EICI. Pursuant to a Capital Contribution Agreement, dated December 10, 1993, RD Leasing and EICI were obligated to make contributions to the capital of Andantech in amounts proportionate to their respective membership interests; accordingly, RD Leasing contributed $14,817,382.05, and EICI contributed $302,395.55 to Andantech.

RD Leasing received from NEFI the $14,817,382.05 it needed to contribute to the capital of Andantech. (NEFI had agreed (in the Exchange Agreement) that it would purchase 100 additional shares of common stock in RD Leasing for $14,817,382.05.) EICI borrowed from UBS the $302,395.55 it needed to contribute to the capital of Andantech. The bank records show that Comdisco guaranteed the UBS loan to EICI.

RD Leasing and EICI made their capital contribution by wiring $14,817,382.05 and $302,395.55, respectively, directly to UBS' account in payment of the bank loan.

VIII. Sale of Computer to End User

In April 1994, one of the end users opted to purchase the IBM 9021 computer equipment it subleased from Comdisco. The computer was one that had been sold to Andantech. Andantech did not receive any of the proceeds from that sale. Instead, Comdisco elected to substitute replacement equipment. Comdisco neither provided notice to Andantech that it was exercising its right to substitute replacement equipment nor invoked the procedures for substitution required by the equipment lease.

The equipment lease imposed an obligation upon Comdisco to provide Andantech with annual reports, which, among other things, contained information as to the location of the equipment. CIG provided Andantech with location reports relating to the equipment on March 1, 1994, February 27, 1995, and February 28, 1996. Ms. Grossman received these reports.

The 40 mainframe computers in Andantech's portfolio were identified by serial number in the location reports. The computers shown in the reports had the same serial numbers as those that were on the 1993 bill of sale. The location of the equipment (and the sublessee) sometimes changed. In light of the fact that the CIG location reports reflected no changes in the serial numbers, Ms. Grossman was unaware that Comdisco had substituted replacement equipment for one of the 40 computers that Andantech purchased.

IX. Comdisco's Exercise of Early Termination Options

On April 25, 1996, Comdisco informed Andantech that it was exercising its early termination option to purchase the equipment in categories E through I (i.e., the IBM mainframes in the 9021 series). On May 30, 1996, Comdisco received from Computer Information Resources (CIR) an appraisal of the equipment in these five categories, valuing the computers at $11,444,000.

Ms. Grossman asked Don Oram, an NEFI equipment manager, to independently investigate the value of the equipment. After reviewing several reports (Computer Price Watch and the Gartner Group reports), on May 27, 1996, Mr. Oram informed Ms. Grossman

that the value of the equipment in categories E through I was between $11,600,000 and $12,225,000.

The principal amounts of the balloon notes for categories E through I (junior promissory notes 2e-2i) were: $1,083,615; $699,454; $3,891,020; $2,313,841; and $7,933,856, respectively. The aggregate principal amount was $15,921,786. The notes bore interest at 9 percent, compounded monthly. The total liability on the early termination date was $20,222,439.

Ms. Grossman and Mr. Vandermark discussed Comdisco's exercise of its early termination option, as well as Comdisco's belief that the value of the equipment in categories E through I was less than the liability for principal and interest on the balloon notes. Mr. Vandermark was disconcerted to learn that there was a good chance that RD Leasing would receive nothing for its position in the lease. On May 30, 1996, Ms. Grossman engaged ARI Propertylink Co. (ARI Propertylink) to appraise the 40 mainframe computers comprising the Andantech portfolio as of the early termination dates. Mary O'Connor (who had appraised the equipment in 1993) was ARI Propertylink's appraiser.

On June 5, 1996, ARI Propertylink advised Ms. Grossman that the value of the equipment was $13,465,000. The appraisal stated that the equipment had "eroded" in value more rapidly than had been anticipated in 1993 because of: (1) A change in IBM pricing strategy (i.e., increased discounting); (2) an increase in production of mainframes by IBM; (3) the introduction of new

products by IBM's competitors (Amdahl Corp. and Hitachi Data Systems, Inc.); and (4) the introduction of "CMOS based parallel architecture" on April 5, 1994.  On June 6, 1996, CIG advised Andantech that the value of the equipment in categories E through I inclusive did not exceed the principal plus accrued interest due on junior promissory notes 2e through 2i.

After analyzing the information received from Mr. Oram and the ARI PropertyLink appraisal, Ms. Grossman concluded that Andantech was not entitled to consideration from Comdisco for the equipment in categories E through I, beyond the cancellation of the balloon notes relating thereto.  Thus, Andantech accepted Comdisco's determination that the value of the equipment in categories E through I did not exceed the principal plus accrued interest on junior promissory notes 2e through 2i.

On July 2, 1996, Andantech executed a bill of sale for the equipment in categories E through I to Comdisco.  On July 10, 1996, Comdisco canceled the balloon notes relating to the equipment in categories E through I (i.e., junior promissory notes 2e-2i).

On August 23, 1996, Comdisco advised Andantech that it was exercising its early termination option to purchase the equipment in categories A through D (i.e., the 9121 models).  Comdisco engaged two additional companies to provide appraisals of the equipment in category A as of the early termination date.  The findings included the following:  (1) In its September 23, 1996, appraisal, Computer Merchants, Inc. (CMI), concluded that the value

of category A of the equipment was $63,000 (as of September 27, 1996, the early termination date); and (2) in its September 24, 1996, appraisal, CIR concluded that the value of category A of the equipment was $89,000 (as of September 27, 1996). Accordingly, on September 25, 1996, Comdisco advised Andantech that the value of the category A equipment did not exceed the principal plus accrued interest due on the corresponding junior promissory note 2a.

On October 3, 1996, Mr. Oram advised Ms. Grossman that the IBM computers corresponding to equipment in category A had a maximum value of $56,000, as of September 27, 1996. Andantech accepted Comdisco's conclusion that the value of the equipment in category A did not exceed the principal plus accrued interest on junior promissory note 2a. Thereafter, Andantech executed an undated bill of sale of the equipment in category A to Comdisco. On October 8, 1996, Comdisco canceled junior promissory note 2a.

Comdisco subsequently engaged CIR and CMI to appraise the equipment in categories B through D. On October 21, 1996, CMI informed Comdisco that the value of the equipment in categories B through D was $52,000, as of October 27, 1996. On October 25, 1996, CIR advised Comdisco that the value of the equipment in categories B through D was $62,000, as of October 27, 1996. Mr. Oram advised Ms. Grossman of these findings.

In light of these appraisals, Ms. Grossman requested ARI PropertyLink to update its June 4, 1996, appraisal. ARI PropertyLink confirmed its earlier opinion as to the September 27,

1996, value of the equipment in category A, and as to the October 27, 1996, values of the equipment in categories B, C, and D. As a result of the appraisal, Andantech accepted Comdisco's determination that the value of the equipment in categories B through D did not exceed the principal plus accrued interest on three of the balloon notes. Accordingly, on December 5, 1996, Andantech executed a bill of sale of the equipment in categories B through D to Comdisco. On December 12, 1996, Comdisco canceled three of the balloon notes.

The three bills of sale that Andantech executed in 1996 (the 1996 bills of sale) conveyed to Comdisco the identical computers that Andantech had acquired pursuant to the 1993 bill of sale. The serial numbers on the 1996 bills of sale were identical to those on the 1993 bill of sale. Thus, the 1996 bills of sale reflect that Comdisco never replaced any of the computers (i.e., did not substitute a different computer for any of the original Equipment).

As stated previously, the equipment lease provided that Comdisco would pay an early termination supplement if it elected to exercise its early termination option. Comdisco paid early termination supplements of $289,076, $57,084, and $7,206. Pursuant to Andantech's operating agreement, Andantech made an early termination distribution of $353,366 to EICI.

X. Dissolution of RD Leasing and Andantech

On May 1, 1997, RD Leasing was dissolved. On or about May 29, 1997, Andantech was dissolved.

XI.  Andantech's Federal Income Tax Returns

Andantech filed a Form 1065, U.S. Partnership Return of Income, for the short tax year beginning September 28, 1993, and ending December 10, 1993 (the 12/10/93 short period).  On Schedule K, Partners' Shares of Income, Credits, Deductions, Etc., of the return, Andantech reported $86,930,528 of income that included $86,930,096 of net income from other rental activity ($87,805,801 of gross income from other rental activity and $875,705 of expenses from other rental activity) and $432 of interest income.  Andantech reported on Schedules K-1, Partner's Share of Income, Credits, Deductions, Etc., for Mr. Parmentier, Mr. de la Barre d'Erquelinnes, and NEFI that $85,191,494 of the income was allocated to Mr. Parmentier, $1,738,736 to Mr. de la Barre d'Erquelinnes, and $134 to NEFI.

Andantech also filed a Form 1065 for the short tax year beginning December 11, 1993, and ending December 31, 1993 (the 12/31/93 short period).  On Schedule L, Balance Sheets, of the return, Andantech reported $20,459,014 as liability on mortgages, notes, and bonds payable in 1 year or more.  On Schedule K of the return, Andantech reported a $2,143,937 loss attributed to a $2,040,263 depreciation deduction and a $103,674 interest deduction.  Andantech reported no gross income from other rental activity.  Andantech reported on Schedules K-1 that 98 percent of

the loss was allocated to RD Leasing and 2 percent to EICI. The loss allocated to RD Leasing was included in Norwest's 1993 consolidated return.

Andantech filed a Form 1065 for the tax year ending December 31, 1994. On Schedule L of the return, Andantech reported $22,378,210 as liability on mortgages, notes, and bonds payable in 1 year or more. On Schedule K of the return, Andantech reported a $50,069,397 loss attributed to a $48,150,200 depreciation deduction and $1,919,197 interest deduction. Andantech reported no gross income from other rental activity. Andantech reported on Schedules K-1 that 98 percent of the loss was allocated to RD Leasing and 2 percent to EICI. The loss allocated to RD Leasing was included in Norwest's 1994 consolidated return.

## XII. Respondent's Determinations

### A.   FPAAs for the 1993 Short Years

On January 14, 2000, respondent issued a notice of final partnership administrative adjustments (FPAA) regarding Andantech's 12/10/93 short period (the 12/10/93 FPAA). On January 14, 2000, respondent also issued an FPAA regarding Andantech's 12/31/93 short period (the 12/31/93 FPAA).[16]

Respondent determined that Andantech's claimed 12/10/93 short

---

[16]   As explained hereinafter, respondent contends that there is only one 1993 taxable period for Andantech and that there was no termination of the partnership on Dec. 10, 1993.

period should be disregarded and all income and deductions for that period should be reported in Andantech's 12/31/93 short period.  In the 12/10/93 FPAA, respondent determined that the $86,930,096 income reported should be reduced to zero for the 12/10/93 short period.  In the 12/31/93 FPAA, respondent determined that Andantech should have reported income of $87,805,801, rather than the $2,143,937 loss.  Respondent increased the gross income for the sale of the receivable and disallowed all the claimed deductions.

Included with each copy of the 12/10/93 FPAA and the 12/31/93 FPAA was a letter advising each person of his or its right to elect to have partnership items treated as nonpartnership items pursuant to section 6223(e).  Neither Mr. Parmentier, Mr. de la Barre d'Erquelinnes, NEFI, RD Leasing, Norwest, nor EICI filed such an election.

On April 17, 2000, NEFI and Norwest timely filed a petition for Andantech's 12/31/93 short period (docket No. 4277-00).  On June 6, 2000, EICI timely filed a petition for Andantech's 12/10/93 short period (docket No. 6348-00).

B.   FPAA for the 1994 Taxable Year

On June 19, 1998, respondent issued an FPAA with regard to Andantech's 1994 tax year (the 1994 FPAA).  Respondent determined in the 1994 FPAA that $50,069,397 of deductions claimed by Andantech should be disallowed.  Alternatively, respondent determined in the 1994 FPAA that the "sale" of the lease receivable

was a "financing arrangement" and consequently Andantech's income should be increased by $34,482,268 for rent payable in 1994.

On September 21, 1998, NEFI and Norwest timely filed a petition for Andantech's 1994 taxable year (docket No. 15532-98).

OPINION

I.  Procedural Issues

At the outset, we deal with two procedural matters.  First, we determine whether for purposes of this litigation the statute of limitations period under section 6501(a) expired with respect to the 12/10/93 short period and/or the 12/31/93 short period.  Second, we determine whether the FPAAs for the 12/10/93 short period and/or the 12/31/93 short period are valid.

First, we turn to the period of limitations matter. Petitioners acknowledge that the period for assessing a deficiency in tax under section 6501(a) remains open for RD Leasing and EICI. They assert, however, that section 6501(a) is inapplicable to partnership items and affected items.  They maintain that the period for assessing a deficiency related to partnership items and affected items is controlled by section 6229(a), and that the periods within which respondent could issue an FPAA with respect to Andantech's 12/10/93 short period and its 12/31/93 short period had expired under section 6229(a) before the mailing of those FPAAs.

Petitioners' position is contrary to our holding in Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner, 114 T.C. 533 (2000), interlocutory appeal dismissed (for lack of appellate

jurisdiction) and remanded to the Tax Court for further proceedings on the merits 249 F.3d 175 (3d Cir. 2001). See also CC & F W. Operations Ltd. Pship. v. Commissioner, T.C. Memo. 2000-286, affd. 273 F.3d 402 (1st Cir. 2001). In Rhone-Poulenc, we stated that section 6501(a) provides a general period of limitations for assessing and collecting any tax imposed by the Code. Section 6229(a) sets forth a minimum period for assessing any income tax with respect to any person that is attributable to any partnership item or affected item; this minimum period can be greater than, or less than, the period of limitations in section 6501. Id. at 540-543.

Section 6501 contains no exception for deficiencies attributable to partnership items. In drafting section 6229, Congress did not create a completely separate statute of limitations for assessments attributable to partnership items. Id. at 545. Section 6229 merely supplements section 6501. CC & F W. Operations Ltd. Pship. v. Commissioner, supra.

Petitioners concede that under the holding of Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner, supra, the limitations period has not expired. They, however, request that we reconsider Rhone-Poulenc. We decline to do so. We hold, therefore, that the period of limitations for issuing the FPAAs for both 1993 short periods had not expired at the time the FPAAs were issued.

Second, we rely upon Wind Energy Tech. Associates III v.

Commissioner, 94 T.C. 787 (1990), to conclude that issuing an FPAA during the 120-day period set out in section 6223(d)(1) does not invalidate an FPAA. Accordingly, we hold that the FPAAs for the 12/10/93 short period and the 12/31/93 short period are valid.

II. Whether the Sale-Leaseback Transaction Should Be Respected

We now turn to the substantive issue before us; namely, whether the sale-leaseback transaction involved should be respected for Federal tax purposes.

In essence, this case involves the stripping of income from Andantech's sale of the Comdisco rents (which income, for tax purposes, passed through untaxed to Belgian citizens and residents) and the subsequent use by Norwest (on its consolidated returns for the years at issue) of Andantech's losses from depreciation deductions and interest expense related to Andantech's purchase and lease of the computer equipment.

A. Overview of Statutory Framework for the Transactions

We begin our analysis with an overview of the transactions involved herein, and the statutory provisions and caselaw within which Comdisco planned the series of transactions that petitioners and Comdisco assert brought into play nonrecognition provisions of the Code governing partnerships and corporations, as well as treaties with foreign governments. This overview presupposes that the transactions and entities are to be respected for Federal tax purposes.

1. Andantech was organized as a limited liability company,

intending to be taxed as a partnership. (Pursuant to sections 701 and 702, a partnership is treated as a flow-through entity for purposes of Federal income taxation.) As such, if Andantech is recognized as a partnership, its items of income, gain, loss, deduction, and credit passed through to its partners.

2. A taxpayer is permitted to sell its right to future income. If a bona fide sale of future income occurs at arm's length and for adequate consideration, then the seller of the future income is taxed in the year of sale on the amount of consideration he actually receives and the buyer is taxed on any excess of income received over his purchase price. Mapco Inc. v. United States, 214 Ct. Cl. 389, 556 F.2d 1107, 1110 (1977). Petitioners assert that the sale-leaseback transaction between Andantech and Comdisco should be respected, and Andantech's sale of the Comdisco rents to NationsBank should be considered a bona fide arm's-length sale for adequate consideration. On this premise, Andantech contends it is deemed to recognize gain from the sale in 1993, the year of the sale, and the income passes through to Andantech's partners (i.e., Messrs. Parmentier and de la Barre d'Erquelinnes/EICI).

3. Pursuant to section 708(b)(1)(B), a partnership is deemed terminated (for Federal tax purposes) upon the sale or exchange of 50 percent or more of the total interest in the partnership's capital and profits within a 12-month period. Here, if as petitioners assert the partnership is to be respected, Mr.

Parmentier's contribution of his 98-percent interest in Andantech to RD Leasing in exchange for RD Leasing's preferred stock caused a deemed termination of the partnership. (For convenience, we will refer to the partnership prior to the deemed termination as Andantech-Foreign.)

If the sale or exchange of a partner's interest in the partnership results in the deemed termination of the partnership, then pursuant to section 708(b)(1)(B), the partnership's taxable year is deemed closed upon the triggering sale or exchange. Sec. 706(c)(1). Consequently, if as petitioners assert the partnership and the sale of the rent receivables are to be respected, Andantech-Foreign's taxable year is deemed closed on December 10, 1993, the date Mr. Parmentier exchanged his 98-percent interest in the partnership for the preferred stock, and Andantech-Foreign is required to include the income from the sale of the Comdisco rents on its return for the 12/10/93 short period. That income would then pass through to Messrs. Parmentier and de la Barre d'Erquelinnes/EICI.

4. Section 894 provides that, to the extent required by any treaty obligation of the United States, income (of any kind) is exempt from U.S. taxation and excluded from gross income. Here, petitioners assert that any income from the sale of the Comdisco rents that passes through to Messrs. Parmentier and de la Barre d'Erquelinnes would be exempt from U.S. taxation pursuant to the treaty between the United States and Belgium. Further, petitioners

assert, pursuant to section 351(a), no gain is recognized by Mr. Parmentier on the exchange of his interest in Andantech for the preferred stock of RD Leasing.[17]  Moreover, petitioners assert, pursuant to section 358(a), Mr. Parmentier's basis in his RD Leasing preferred stock is the same as that in his 98-percent interest in Andantech that was transferred to RD Leasing.  And pursuant to section 362(a)(1), RD Leasing's basis in the 98-percent Andantech interest received from Mr. Parmentier is equal to Mr. Parmentier's basis in the partnership interest immediately before the partnership-interest preferred-stock exchange (approximately $119 million[18]).

---

[17]    Sec. 351(a) provides:

   SEC. 351(a). General Rule.--No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation.

Sec. 368(c) defines control as:

   SEC. 368(c). Control Defined.--* * * ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.

[18]    Mr. Parmentier's basis in his partnership interest, if computed according to petitioners' contentions under secs. 705(a) and 752, would be as follows:

| | |
|---|---|
| Initial contribution Plus | $196,000 |
| Share of UBS loan ($14,995,931 x 98%) | 14,696,012 |
| | (continued...) |

5. Petitioners assert that a termination of Andantech-Foreign occurred, see <u>supra</u> pp. 57-58, resulting in a deemed distribution of partnership property to new and continuing partners (i.e., RD Leasing and EICI) and that there was a deemed recontribution of the property to a newly formed partnership.  Sec. 1.708-1(b)(1)(iv),

---

[18](...continued)

| | |
|---|---:|
| Share of balloon notes ($19,990,512 x 98%) | 19,590,702 |
| Share of term note ($87,429,319 x 98%) | 85,680,733 |
| Share of income | 85,191,494 |
| Less | |
| Share of term note Paid ($87,429,319 x 98%) | (85,680,733) |
| Share of withdrawal ($189,883 x 98%) | (186,085) |
| Basis | 119,488,123 |

Income Tax Regs. (For convenience, we will refer to the new partnership as Andantech-US.)

Continuing, petitioners assert that, upon the deemed recontribution of the property to Andantech-US, Andantech-US acquired a substituted basis in the property equal to the adjusted basis of the property in the hands of the contributing partners, RD Leasing and EICI. Secs. 732, 723.

Thus, according to petitioners, the effect of the deemed termination of Andantech-Foreign is that (1) no gain or loss is recognized to RD Leasing or EICI under section 731(a) or to Andantech-US under section 731(b), (2) Andantech-US has a basis in the computer equipment of $119 million, and (3) RD Leasing has a basis of $119 million in its 98-percent interest in Andantech-US.

6. Section 167 provides for a depreciation deduction with respect to property used in a taxpayer's trade or business or held for the production of income by a taxpayer. Section 168 establishes the appropriate depreciation method, recovery period, and convention for tangible property. (The depreciation deduction allows a taxpayer to recover the cost of the property used in a trade or business or for the production of income. United States v. Ludey, 274 U.S. 295, 300-301 (1927); Durkin v. Commissioner, 872 F.2d 1271, 1276 (7th Cir. 1989), affg. 87 T.C. 1329 (1986).) Here, according to petitioner, Andantech-US's basis in the computer equipment was $119 million, and Andantech-US properly reported the depreciation deduction on its partnership tax returns for the

10/31/93 short year and for 1994. Additionally, petitioners assert that Andantech-US properly reported an interest expense deduction under section 163(a) on its partnership tax returns for those years. Ultimately, RD Leasing and EICI claimed these interest and depreciation deductions as partners of Andantech-US.

B.    Positions of the Parties

Petitioners assert that the sale-leaseback transaction involved herein was a genuine multiple-party transaction, with economic substance that was compelled or encouraged by business realities, and was not shaped solely by tax-avoidance features. As such, petitioners assert that the transaction should be respected for Federal tax purposes because it satisfies the test of Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978).

On the other hand, respondent contends that Comdisco devised a transaction designed to allow foreign parties (not subject to U.S. tax) to realize tax-free rental income, while allowing a U.S. company to report significant tax deductions related to that rental income. Here, approximately $87.8 million in rental income was shifted (i.e., stripped) to non-U.S. taxpayers through Andantech-Foreign, while Norwest, a U.S. taxpayer (for cash and preferred stock totaling approximately $15.4 million), received, through RD Leasing and Andantech-US, more than $100 million of depreciation and interest deductions without recognizing any corresponding rental income. Respondent contends that the "prearranged" transaction at issue should not be respected for Federal tax

purposes because it had no nontax business purpose and lacked economic substance.

C. Analysis

The focus of each party's position, in essence, is in terms of substance over form and related (e.g., sham and step transaction) judicial doctrines. Under these judicial doctrines, although the form of a transaction may literally comply with the provisions of a Code section, the form will not be given effect where it has no business purpose and operates simply as a device to conceal the true character of a transaction. See Gregory v. Helvering, 293 U.S. 465, 469-470 (1935). "To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945). Conversely, if the substance of a transaction accords with its form, then the form will be upheld and given effect for Federal tax purposes. See Blueberry Land Co. v. Commissioner, 361 F.2d 93, 100-101 (5th Cir. 1966), affg. 42 T.C. 1137 (1964).

A transaction may be treated as a sham where (1) the taxpayer is motivated by no business purpose other than obtaining tax benefits, and (2) the transaction has no economic substance because no reasonable possibility of a profit exists. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 91-95 (4th Cir. 1985), affg. on this issue 81 T.C. 184 (1983). But a transaction that has a valid

business purpose and economic substance may still be recast in order to reflect its true nature. Packard v. Commissioner, 85 T.C. 397, 419-422 (1985).

Substance over form and related judicial doctrines all require "a searching analysis of the facts to see whether the true substance of the transaction is different from its form or whether the form reflects what actually happened." Harris v. Commissioner, 61 T.C. 770, 783 (1974). The issue of whether any of those doctrines should be applied involves an intensely factual inquiry. See Gordon v. Commissioner, 85 T.C. 309, 327 (1985); see also Bowen v. Commissioner, 78 T.C. 55, 79 (1982), affd. 706 F.2d 1087 (11th Cir. 1983); Gaw v. Commissioner, T.C. Memo. 1995-531, affd. without published opinion 111 F.3d 962 (D.C. Cir. 1997).

After a thorough review of the record in these consolidated cases, we find, and thus hold, alternatively, the following:

(1) Andantech is not a valid partnership and should not be recognized for Federal tax purposes; more specifically:

(a) Andantech-Foreign should be disregarded because Messrs. Parmentier and de la Barre d'Erquelinnes did not intend to join together as partners for the purpose of carrying on a

business; i.e., they did not join together to share in the profits or losses from Andantech-Foreign's equipment leasing activity; and

(b)  Andantech-US should be disregarded because EICI did not intend to join with RD Leasing for the purpose of carrying on a business; i.e., they did not join together to share in the profits or losses from Andantech-US's equipment leasing activity;

(2)  alternatively, the participation of Messrs. Parmentier and de la Barre d'Erquelinnes, EICI, and Andantech in the transactions  involved herein should be disregarded under the step transaction doctrine;

(3)  additionally, with respect to Andantech, its sale-leaseback transaction with Comdisco was a sham because it (a) was not a true multiple-party transaction, (b) lacked economic substance, (c) was not compelled or encouraged by business realities, and (d) was shaped solely by tax-avoidance features;

(4)  with respect to Norwest and RD Leasing, Andantech's sale-leaseback transaction with Comdisco should not be respected because it lacked business purpose as well as economic substance. Our reasons for these findings/holding now follow.

### 1.  Andantech Is Not a Valid Partnership and Is Not Recognized for Federal Tax Purposes

"A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses." Commissioner v.

Tower, 327 U.S. 280, 286 (1946); see also ASA Investerings Pship. v. Commissioner, 201 F.3d 505, 513 (D.C. Cir. 2000), affg. T.C. Memo. 1998-305.  When the existence of an alleged partnership is challenged, the question arises whether the partners truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both.  Commissioner v. Tower, supra at 286-287.  "Business activity" excludes activity whose sole purpose is tax avoidance.  ASA Investerings Pship. v. Commissioner, supra at 512.

> a.  Andantech-Foreign Should Be Disregarded Because Messrs. Parmentier and de la Barre d'Erquelinnes Did Not Intend To Join Together for the Purpose of Carrying On a Business and Sharing in the Profits or Losses From the Equipment Leasing Activity

In these consolidated cases, we are convinced that Messrs. Parmentier and de la Barre d'Erquelinnes did not intend to join together in order to share in any profit or loss from the business activity of Andantech-Foreign; namely, the sale and leaseback of computer equipment.  Rather, to the contrary, we are convinced that Mr. Parmentier's true business objective was to profit from the preferred stock of RD Leasing that he expected to receive.

The correspondence between Mr. Parmentier's attorney, Mr. Temko, and Comdisco establishes to us that Mr. Parmentier's sole concern was with his potential tax liability and financial risk.  Mr. Parmentier wanted assurances that he and Mr. de la Barre d'Erquelinnes could (1) promptly recover their $200,000 investment,

(2) withdraw from Andantech at no expense, (3) incur no potential liability for Andantech debts, and (4) incur no potential liability in connection with managing Andantech. Further, Mr. Parmentier asked Comdisco to provide assurances that he would be able to exchange his partnership interest for preferred stock on the basis described in the flowcharts and realize the full value of the preferred stock "without any significant risk of impairment". Comdisco attempted to satisfy Mr. Parmentier, Mr. de la Barre d'Erquelinnes, and their counsel as to the minimal risks associated with the transaction.

Messrs. Parmentier and de la Barre d'Erquelinnes contributed comparably minimal (and borrowed at that) funds ($200,000 in a purported $122 million transaction) to Andantech-Foreign, which they withdrew within 3 months. We are satisfied that Andantech-Foreign and Messrs. Parmentier and de la Barre d'Erquelinnes were but mere conduits used by Comdisco and NEFI. Neither took part in any decisions regarding the sale and leaseback of the equipment; rather, all of the negotiations took place between NEFI and Comdisco. NEFI set the criteria for the end users, set the $122 million amount of the transaction, reviewed the projected cashflow (which depended on the $15 million investment from Norwest), and reviewed the documents and instruments for the various transactions (including the sale of the rent receivables).

Mr. Parmentier was rewarded for participating in the transaction involved herein through the redemption of the RD Leasing preferred stock, not through the equipment leasing activity. Further, we are convinced that Mr. de la Barre d'Erquelinnes had no intent to profit, and did not profit, from his participation in any of the transactions. After withdrawing the funds he had contributed to Andantech-Foreign, Mr. de la Barre d'Erquelinnes transferred his 2-percent membership interest in Andantech-Foreign to EICI and then transferred his EICI stock to a charitable support trust established in 1988 by Comdisco.

The purpose underlying Messrs. Parmentier's and de la Barre d'Erquelinnes' participation in the transaction at issue is clearly stated in a September 25, 1993, fax from Barbara Spudis (of the Baker & McKenzie law firm) to that firm's Amsterdam office. The fax stated: "The individuals forming the company are involved for two months during which the income allocation occurs and then the interest is transferred to the U.S. corporate investor who reaps the benefit of ongoing depreciation deductions."

The record reveals that Andantech-Foreign was not created for the purpose of carrying on a trade or business but rather to strip the income from the transaction and avoid U.S. taxation. Consequently, we will not recognize Andantech-Foreign as a partnership for Federal income tax purposes. See ASA Investerings Pship. v. Commissioner, supra.

b.  <u>Andantech-US Should Be Disregarded Because EICI Did Not Intend To Join With RD Leasing for the Purpose of Carrying On Partnership Business and Sharing in the Profits or Losses From the Partnership's Equipment Leasing Activity</u>

After Mr. de la Barre d'Erquelinnes transferred his 2-percent membership interest in Andantech-Foreign to EICI, EICI borrowed from UBS $302,395.55 that it needed to contribute to the capital of Andantech.  Comdisco guaranteed the loan, and UBS treated the loan as a loan to Comdisco.  Mr. de la Barre d'Erquelinnes then transferred his EICI stock to a charitable support trust established in 1988 by Comdisco.

There is no evidence that EICI had assets other than its interest in Andantech.  Moreover, EICI's only means of repaying the UBS loan was through its 6-percent priority return distribution in the event Comdisco exercised its early termination option.

EICI did not participate in the negotiations of the transactions and did not intend to profit, and did not profit, from the transactions.  EICI did not join with RD Leasing for purposes of carrying on a trade or business or sharing in profit or loss from the sale-leaseback transaction.

EICI did not exist before the transactions at issue.  It was created as a vehicle to dispose of Mr. de la Barre d'Erquelinnes's 2-percent interest and to create the illusion of a second participant required for partnership classification.  Under the principles of <u>Gregory v. Helvering</u>, 293 U.S. 465 (1935), Andantech-US is not recognized as a valid partnership for Federal income tax

purposes.

### 2. Andantech Acted as a Mere Shell or Conduit To Strip the Income From the Transaction and Avoid Income Taxation and, Under the Step Transaction Doctrine, Should Be Disregarded

Even if we believed Andantech should be respected as a valid partnership (which we do not), it should be disregarded under the step transaction doctrine. "Under the step-transaction doctrine, a particular step in a transaction is disregarded for tax purposes if the taxpayer could have achieved its objective more directly, but instead included the step for no other purpose than to avoid U.S. taxes." Del Commercial Props., Inc. v. Commissioner, 251 F.3d 210, 213-214 (D.C. Cir. 2001), affg. T.C. Memo. 1999-411; see also Penrod v. Commissioner, 88 T.C. 1415, 1428-1430 (1987). As described in Smith v. Commissioner, 78 T.C. 350, 389 (1982):

> The step transaction doctrine generally applies in cases where a taxpayer seeks to get from point A to point D and does so stopping in between at points B and C. The whole purpose of the unnecessary stops is to achieve tax consequences differing from those which a direct path from A to D would have produced. In such a situation, courts are not bound by the twisted path taken by the taxpayer, and the intervening stops may be disregarded or rearranged. [Citation omitted.]

The existence of business purposes and economic effects relating to the individual steps in a complex series of transactions does not preclude application of the step transaction doctrine. True v. United States, 190 F.3d 1165, 1176-1177 (10th Cir. 1999).

> To ratify a step transaction that exalts form over substance merely because the taxpayer can either (1)

articulate some business purpose allegedly motivating the indirect nature of the transaction or (2) point to an economic effect resulting from the series of steps, would frequently defeat the purpose of the substance over form principle. Events such as the actual payment of money, legal transfer of property, adjustment of company books, and execution of a contract all produce economic effects and accompany almost any business dealing. Thus, we do not rely on the occurrence of these events alone to determine whether the step transaction doctrine applies. Likewise, a taxpayer may proffer some non-tax business purpose for engaging in a series of transactional steps to accomplish a result he could have achieved by more direct means, but that business purpose by itself does not preclude application of the step transaction doctrine. * * *

Id. at 1177.

Under the step transaction doctrine, a series of formally separate steps may be collapsed and treated as a single transaction if the steps are in substance integrated and focused toward a particular result. Courts have applied three alternative tests in deciding whether the step transaction doctrine should be invoked in a particular situation; namely, (1) if at the time the first step was entered into, there was a binding commitment to undertake the later step (binding commitment test), (2) if separate steps constitute prearranged parts of a single transaction intended to reach an end result (end result test), or (3) if separate steps are so interdependent that the legal relations created by one step would have been fruitless without a completion of the series of steps (interdependence test). See Penrod v. Commissioner, supra at 1428-1430. More than one test might be appropriate under any given set of circumstances; however, the circumstances need satisfy only

one of the tests in order for the step transaction doctrine to operate. <u>Associated Wholesale Grocers, Inc. v. United States</u>, 927 F.2d 1517, 1527-1528 (10th Cir. 1991) (finding end result test inappropriate but applying the step transaction doctrine using the interdependence test). We now turn to the application of these three tests to the transaction involved herein.

### a. Binding Commitment Test

We first consider the application of the binding commitment test. Petitioners posit that RD Leasing was not bound to engage in the transaction until it actually entered the transaction in December 1993, and that Messrs. Parmentier and de la Barre d'Erquelinnes formed Andantech-Foreign independent of any commitment by RD Leasing. For the reasons set forth below, we do not believe it is appropriate to apply the binding commitment test to our step transaction analysis in this case.

The purpose of the binding commitment test is to promote certainty in tax planning; it is the most rigorous limitation of the step transaction doctrine. It is seldom used and is applicable only where a substantial period of time has passed between the steps that are subject to scrutiny. Thus, it is not an appropriate test to apply to the transactions before us inasmuch as the transactions were prearranged by Comdisco, completed in 6 months, and fell entirely within a single tax year. See, e.g., <u>Associated Wholesale Grocers, Inc. v. United States</u>, <u>supra</u> at 1522 n.6 (rejecting use of the binding commitment test because the case did

not involve a series of transactions spanning several years). Because the transactions in the present case do not span a long period of time or involve a binding commitment to pursue successive steps, we do not analyze them under the binding commitment test. Thus, in this case, only the end result and interdependence tests are relevant to our step transaction analysis.

b.    End Result Test

We now turn to the application of the end result test.  The end result test combines into a single transaction separate events that appear to be components of something undertaken to reach a particular result.  Kornfeld v. Commissioner, 137 F.3d 1231, 1235 (10th Cir. 1998), affg. T.C. Memo. 1996-472; Associated Wholesale Grocers, Inc. v. United States, supra at 1523.  Under the end result test, if we find that a series of closely related steps in a transaction is merely the means to reach a particular end result, we will not separate the steps but instead will treat them as a single transaction.  King Enters., Inc. v. United States, 189 Ct. Cl. 466, 418 F.2d 511, 516 (1969); see also Helvering v. Ala. Asphaltic Limestone Co., 315 U.S. 179 (1942); Morgan Manufacturing Co v. Commissioner, 124 F.2d 602 (4th Cir. 1941), affg. 44 B.T.A. 691 (1941); Heintz v. Commissioner, 25 T.C. 132 (1955); Ericsson Screw Mach. Prods. Co. v. Commissioner, 14 T.C. 757 (1950).

The end result test focuses upon the actual intent of the parties as of the time of the transaction.  It is flexible and bases tax consequences on the substance of the transaction, not on

the formalisms chosen by the participants.  "The intent we focus on under the end result test is not whether the taxpayer intended to avoid taxes. * * * Instead, the end result test focuses on whether the taxpayer intended to reach a particular result by structuring a series of transactions in a certain way."  True v. United States, 190 F.3d at 1175.

Under the end result test, there is no independent tax recognition of the individual steps unless the taxpayer shows that at the time the parties engaged in the individual step, its result was the intended end result in and of itself.  Id.  If this is not what was intended, then we collapse the series of steps and give tax consideration only to the intended end result.  Id.  "The doctrine derives vitality, rather, from its application where the form of a transaction does not require a particular further step be taken; but, once taken, the substance of the transaction reveals that the ultimate result was intended from the outset." (Emphasis in original.)  King Enters., Inc. v. United States, supra at 518.

Applying the end result test to the sale-leaseback transaction at issue, we examine whether Comdisco and Norwest intended from the outset to transfer the benefits and burdens of the sale-leaseback of the equipment to RD Leasing.  If the intended end result was for RD Leasing to have those benefits and burdens, then petitioners cannot claim a right to favorable tax treatment for the various intermediate transactions leading up to that intended result.

The record clearly indicates that every step taken by the

parties (the formation of Andantech, the sale-leaseback of the equipment between Comdisco and Andantech, the sale of the Comdisco rents to NationsBank, and the contribution by Mr. Parmentier of his interest in Andantech to RD Leasing) were but transitory steps.

All the legal documents relating to the transactions, including the sale of the Comdisco rents, were negotiated and reviewed by NEFI; and all profit and cashflow projections were based on the assumption that a U.S. company would invest $15 million. We are unable to glean from the record that Messrs. Parmentier and de la Barre d'Erquelinnes ever contemplated making (and there is no evidence that they had the means to make) a $15 million investment. (On the other hand, NEFI bore the risk of loss of its $15 million investment.) Moreover, the financial projections never evaluate the transaction on the basis of the initial contributions made by Messrs. Parmentier and de la Barre d'Erquelinnes. Simply put, we are of the opinion that Messrs. Parmentier and de la Barre d'Erquelinnes never intended to place their funds at risk. They withdrew their minimal contributions as soon as practicable and before transferring their interests to RD Leasing and EICI. It is obvious to us that Mr. Parmentier's only concerns in entering into the arrangement were to ensure that he would not be taxed on the sale of the Comdisco rents and that he would profit from his receipt of the preferred stock. Neither Mr. Parmentier nor Mr. de la Barre d'Erquelinnes had any of the benefits or burdens associated with the sale-leaseback transaction.

The intended result from the outset was to pass the benefits and burdens of the sale-leaseback transaction to RD Leasing in order to allow Norwest to claim large depreciation deductions and for Mr. Parmentier to make his profit through the value of RD Leasing's preferred stock.

Thus, by applying the end result test, we will give tax consideration only to that intended result.

### c. Interdependence Test

We reach the same conclusion by reviewing the transactions under the interdependence test. The "interdependence" test focuses on whether "the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." Redding v. Commissioner, 630 F.2d 1169, 1177 (7th Cir. 1980), revg. and remanding 71 T.C. 597 (1979); see also Kass v. Commissioner, 60 T.C. 218 (1973), affd. without published opinion 491 F.2d 749 (3d Cir. 1974); Farr v. Commissioner, 24 T.C. 350 (1955); Am. Wire Fabrics Corp. v. Commissioner, 16 T.C. 607 (1951); Am. Bantam Car Co. v. Commissioner, 11 T.C. 397 (1948), affd. 177 F.2d 513 (3d Cir. 1949). This test concentrates on the relationship between the steps, rather than on their "end result". See Sec. Indus. Ins. Co. v. United States, 702 F.2d 1234, 1245 (5th Cir. 1983).

The interdependence test requires a court to find whether the individual steps had independent significance or had meaning only as part of the larger transaction. Penrod v. Commissioner, 88 T.C.

at 1429-1430.  If the steps have "reasoned economic justification standing alone", then the interdependence test is inappropriate. Sec. Indus. Ins. Co. v. United States, supra at 1247.  If, however, the only reasonable conclusion from the evidence is that the steps have "meaning only as part of the larger transaction", then the step transaction doctrine applies as a matter of law.  Id. at 1246. In order to maintain this objectivity and ensure the steps have independent significance, it is useful to compare the transactions in question with those usually expected to occur in otherwise bona fide business settings.  See Merryman v. Commissioner, 873 F.2d 879, 881 (5th Cir. 1989), affg. T.C. Memo. 1988-72.

Here, the sale-leaseback transaction between Comdisco and Andantech-Foreign and the sale of the Comdisco rents by Andantech-Foreign to NationsBank would not have taken place without the planned participation of RD Leasing.  This point is demonstrated both by the importance of the preferred stock to Mr. Parmentier in the negotiations and the certain financial failure of Andantech-Foreign without a cash infusion from RD Leasing.

Petitioners assert that the financial projections using forecasts of the residual values made by the appraisers in 1993 show that Andantech had a reasonable opportunity to earn a profit from the transaction.  All of the financial projections, however, were made on the basis of the $15 million supplied by RD Leasing and the avoidance of Federal income tax on the rents payable by Comdisco.

Mr. Parmentier's failure to seriously evaluate the likely residual value of the equipment, his willingness to pay an arbitrary purchase price, and his minimal investment in the partnership (which would facilitate his abandonment of the transaction in the event RD Leasing failed to take the next step), collectively persuade us that Mr. Parmentier and Andantech-Foreign did not have profit motivation for entering into the sale-leaseback transaction.

Additionally, the loans to Andantech were attributable to a desire by UBS and NationsBank to accommodate Comdisco. UBS, which ultimately provided the approximate $15 million cash needed for the purchase of the equipment, had provided similar amounts for other similar Comdisco deals. UBS made the loan to Andantech on the basis of Comdisco's creditworthiness and on the basis that the earlier loans had been paid off, usually within 3 months. On the other hand, Andantech had minimal assets. Its only means of paying the interest due on the approximate $15 million loan was from the rents due from Comdisco. But Andantech had "sold" the Comdisco rents to NationsBank and was required to use the proceeds received from NationsBank to pay off the $87 million term note owed to Comdisco. Thus, after the sale of the Comdisco rents to NationsBank, Andantech had no means of paying the substantial interest accruing on the approximate $15 million UBS loan as the interest became due.

The funds provided by RD Leasing did not just enhance the

financial condition of the partnership; they were essential to the solvency of the partnership. The financial limitations placed on Andantech made it extremely likely that the transfer of Mr. Parmentier's interest to RD Leasing would, as it did, take place promptly.

Our review of the entire record persuades us that the transactions did not take the form they did in order to afford Andantech an opportunity to earn a profit. To the contrary, we are convinced that the only purpose for structuring the sale-leaseback transaction between Comdisco and Andantech, rather than directly between Comdisco and RD Leasing, was to avoid tax that would have been paid by NEFI on the acceleration of rental income from the sale of the Comdisco rents had the transactions been structured as direct sale-leaseback transactions between Comdisco and RD Leasing. We find that Andantech acted as a mere shell or conduit to strip the income from the transaction and avoid income for RD Leasing.

Accordingly, we hold the steps involved in the transactions at issue lack any reasoned economic justification standing alone. As stated, there was no apparent purpose for Messrs. Parmentier and de la Barre d'Erquelinnes to purchase (through Andantech) and lease back the equipment other than to facilitate the eventual transfer of the property into the hands of RD Leasing. Andantech did not exist before this transaction. It was created as a limited liability company to serve as a passthrough vehicle specifically for the transaction at issue.

The exchange of Mr. Parmentier's partnership interest for the RD Leasing preferred stock is suspect. RD Leasing was a shell corporation and was not involved in equipment leasing. It was recapitalized for the purpose of engaging in this transaction. Mr. Parmentier was not interested in any true investment in RD Leasing. He wanted cash but agreed to take and hold the RD Leasing preferred stock only in order to qualify the exchange under section 351.

RD Leasing was required to maintain sufficient funds to pay the liquidation preference to Mr. Parmentier. We see no apparent reasons for the use of an exchange of the preferred stock for Mr. Parmentier's interest in Andantech other than to facilitate the tax-free transfer of the depreciation deductions to Norwest and to compensate Mr. Parmentier for his services.

Standing alone, none of the individual steps in the transaction at issue is the type of business activity one would expect to see in a bona fide, arm's-length business deal between unrelated parties, and none of them makes any objective sense standing alone without contemplation of the subsequent steps in the transaction. Each step in the transaction leads inexorably to the next. Consequently, the interdependence test is satisfied for application of the step transaction doctrine.

We are of the opinion that NEFI and Comdisco recognized that a direct transaction with RD Leasing would result in the offset of depreciation deductions with the income from the rents. Consequently, they passed ownership of the equipment through

Andantech-Foreign in order to produce a more favorable tax result. By channeling the sale and leaseback of the equipment through Andantech-Foreign, and by using a series of unnecessary exchanges and transfers, RD Leasing through Andantech-US ended up with a high basis in the equipment. It would be unreasonable to assume that the convoluted steps used in this transaction were anything other than an integrated plan (prearranged by Comdisco and NEFI) to accomplish tax advantages that could not be accomplished otherwise. In essence, Comdisco and NEFI changed what would have been the natural result of a direct purchase of the equipment by engaging in a series of steps designed from the outset to circumvent the intent of the Code. Fundamental principles of taxation dictate that "A given result at the end of a straight path is not made a different result because reached by following a devious path." Minn. Tea Co. v. Helvering, 302 U.S. 609, 613 (1938). Consequently, we (1) ignore the indirect route of the individual steps, (2) view the transactions in their entirety, and (3) treat the transaction as one between Comdisco and NEFI.

Under either the end result test or the interdependence test, courts will ignore a step in a series of transactions if that step does not appreciably affect the taxpayer's beneficial interest except to reduce his tax. Del Commercial Props., Inc. v. Commissioner, 251 F.3d 210 (D.C. Cir. 2001). There must be a purpose for each step other than tax avoidance and the purpose cannot be a "facade". Id. at 214. The absence of a valid nontax

business purpose is fatal.  Id.

After reviewing Comdisco's equipment leasing concept, see supra pp. 10-12, and the economic effect of the transaction, we conclude that the insertion of Andantech into the sale-leaseback transaction involved herein served no valid nontax business purpose and was devoid of any economic substance.  Regardless of which test is used under the step transaction doctrine, the facts in this case require us to reach the same result.

If the sole purpose of a transaction with a foreign entity "is to dodge U.S. taxes, the treaty cannot shield the taxpayer from the fatality of the step-transaction doctrine.  For a taxpayer to enjoy the treaty's tax benefits, the transaction must have a sufficient business or economic purpose."  Del Commercial Props., Inc. v. Commissioner, supra at 213-214; see also Gaw v. Commissioner, T.C. Memo. 1995-531, affd. without published opinion 111 F.3d 962 (D.C. Cir. 1997).  The foreign entity must serve a role with a sufficient business or economic purpose to overcome the conduit nature of the transaction.  Del Commercial Prop., Inc. v. Commissioner, supra at 215.

In this case, the creation of Andantech-Foreign did not appreciably affect Norwest's interests in the sale-leaseback arrangement, except to reduce its U.S. tax.  Andantech-Foreign's sole purpose was to enable Norwest to obtain the benefits of an exemption established by treaty for income attributable to the sale of the Comdisco rents.  And a tax-avoidance motive standing by

itself is not a business purpose which is sufficient to support a transaction for tax purposes. See Knetsch v. United States, 364 U.S. 361 (1960); Higgins v. Smith, 308 U.S. 473 (1940); Gregory v. Helvering, 293 U.S. at 469.

### 3. The Sale-Leaseback Transaction Lacked Business Purpose and Economic Substance

We also agree with respondent that, even if we did not disregard Andantech's participation in the transaction, the sale-leaseback transaction should not be respected for Federal income tax purposes.[19]

Courts will give effect to "a genuine multiple-party transaction with economic substance that is compelled or encouraged by business or regulatory realities, that is imbued with tax-independent considerations, and that is not shaped solely by tax-avoidance features to which meaningless labels are attached". Frank Lyon Co. v. United States, 435 U.S. at 562.

In Horn v. Commissioner, 968 F.2d 1229 (D.C. Cir. 1992), the Court of Appeals for the D.C. Circuit set forth the following test for determining whether a transaction should be considered a sham for tax purposes:

"To treat a transaction as a sham, the court must find

---

[19] We note that, if the transaction has economic substance, then RD Leasing is entitled to the interest and depreciation deductions but must include the income from the sale of the Comdisco rents. If, on the other hand, the transaction lacks economic substance, then RD Leasing is not entitled to the claimed deductions and is not required to include the income from the sale of the rents.

[1] that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, and [2] that the transaction has no economic substance because no reasonable possibility of profit exists." * * *

Id. at 1237 (quoting Friedman v. Commissioner, 869 F.2d 785, 792 (4th Cir. 1989)); see also IES Indus., Inc. v. United States, 253 F.3d 350 (8th Cir. 2001); ACM Partnership v. Commissioner, 157 F.3d 231 (3d Cir. 1998), affg. in part, revg. in part, dismissing in part, and remanding T.C. Memo. 1997-115; Salina Partnership, L.P. v. Commissioner, T.C. Memo. 2000-352; Shriver v. Commissioner, T.C. Memo. 1987-627, affd. 899 F.2d 724, 727 (8th Cir. 1990).  Our inquiry as to the business purpose and economic substance of a transaction is inherently factual.  See Torres v. Commissioner, 88 T.C. 702, 718 (1987).

In this case, we conclude that the sale-leaseback should not be respected for tax purposes because (1) no reasonable possibility for profit existed, and (2) RD Leasing was not motivated by any business purpose other than obtaining tax benefits.

Petitioners and respondent each retained expert witnesses to assess the possibility of profit with respect to the sale-leaseback transaction involved herein.

### a.   The Experts

 In total, nine experts testified--five for petitioners and four for respondent.  Two of the experts (David Fleming for petitioners and Dr. James Schallheim for respondent) testified as to the economics of the transaction.  In particular, each testified

as to the pretax returns RD Leasing could expect to receive. Each agreed that if the estimated residual values of the computers (as determined by M&S, MAC, and ARI) were attainable, then the leases were economically viable (i.e., had economic substance) without regard to tax considerations. The two experts differed, however, on the amount of pretax return attainable.

In reviewing the other's report, Mr. Fleming and Dr. Schallheim each had one "major" disagreement with respect to the computation of yield, specifically, the computations of yield with regard to the scenario where Comdisco does not exercise its early termination option. In his rebuttal report, Dr. Schallheim stated that Mr. Fleming included $2,711,993 as rents to be received by Andantech, whereas Dr. Schallheim thought those rents had been sold to NationsBank. (In addition, Dr. Schallheim found that Mr. Fleming had understated the interest on the balloon notes in the full term option by $268,541.)

Dr. Schallheim based his conclusion on his understanding of the definition of the term "Sale Rents" in the lease receivable purchase agreement. That provision, which defined the rents sold to NationsBank, stated that "Sale Rents" would mean "all payments of Rent payable under the Lease after the Closing Date but before the Early-Termination Date as set forth on Schedule I." (Schedule I was captioned "Rents Sold to Purchaser" and provided specific dollar amounts of the rents that were sold.) Dr. Schallheim testified that he treated all rents payable before the early

termination dates as having been sold, whether or not they were listed on Schedule I. Dr. Schallheim also based his conclusion on the fact that Andantech-U.S. did not receive any rent payments from Comdisco.

Thompson Ryan, one of petitioners' experts, testified that had the projected residual values of the computers been realized, and had Comdisco exercised its early termination option, then the pretax return for RD Leasing would have been 6.6 percent, as reflected in the September Projections. John Deane, one of respondent's experts, agreed with Mr. Ryan's calculation; however, Mr. Deane believed a 6.6-percent return was at, or slightly below, the low end of what an investor would consider acceptable in 1993.

The other experts (Ralph Page, Mary O'Connor, and Patrick Callahan for petitioners and Susan Middleton and Peter Daley for respondent) opined as to the reasonableness of the projected residual values of the computers. Petitioners' experts testified that the price paid for the computers was fair and that the projected residual values were attainable. Not surprisingly, respondent's experts believed otherwise.

Mr. Daley was the publisher of two industry reports--the DMC End-User Market Value Report and the DMC Residual Value Report. The information contained in these reports was based on computer (and related equipment) sales between dealers; hence, the amounts reflected in the DMC reports were wholesale (marked up by 10 percent), rather than retail, prices. On the basis of the

information contained in his reports, Mr. Daley opined that the purchase price of the computers was inflated and that the projected residual values of the computers were unattainable.

Ms. Middleton, an expert in the field of residual valuation of mainframe computers at IDC, rebutted the expert opinion of Mr. Page. She opined that Mr. Page's estimated economic life for the equipment was too long and explained that IDC projected a 6- to 7-year life for the equipment as of June/July 1993. On the basis of the residual values forecast by IDC in its IBM June/July 1993 Residual Value Report, the residual value of the equipment on the early termination date was less than $20 million, and on the termination date it was less than $10 million. Ms. Middleton testified that IDC did not take into account (in its residual value forecasting) the value of computers on lease, or the "lease premium".

The experts made their evaluation of residual values on the basis of a percentage of list price, as did the three September 1993 appraisals. The following table sets forth the percentages used in the various appraisals as well as the percentages published in DMC's 1993 publication:

### Computation of Residual Value  as Percentage of List Price (LP)

| Early Termination Date | | I<br>% of LP | II<br>% of LP | III<br>% of LP | IV<br>% of LP | V<br>8 Years<br>% of LP | VI<br>% of LP<br>Retail/Wholesale |
|---|---|---|---|---|---|---|---|
| Type/Model Category | | | | | | | |
| 9021/720/E | 5/27/96 | 6.67% | 8% | 7% | 7.96% | 1.81% | 2.0/1.8% (4/96) |
| 9021/740/F | 5/27/96 | 12.67 | 14 | 13 | 14.83 | 5.35 | 6.1/5.5 (4/96) |
| 9021/820/G | 5/27/96 | 12.67 | 14 | 13 | 13.70 | 4.81 | 5.5/4.9 (4/96) |
| 9021/860/H | 5/27/96 | 12.67 | 14 | 13 | 14.12 | 4.81 | 5.5/5.0 (4/96) |
| 9021/900/I | 5/27/96 | 12.67 | 14 | 13 | 13.63 | 4.77 | 5.4/4.9 (4/96) |
| 9121/260/A | 9/27/96 | 20.66 | 20 | 20 | 13.44 | 5.27 | 5.2/4.7 (10/96) |
| 9121/320/B | 10/27/96 | 19.75 | 21 | 20 | 11.87 | 4.26 | 4.7/4.2 (10/96) |
| 9121/440/C | 10/27/96 | 19.75 | 20 | 20 | 15.14 | 4.09 | 4.5/4.0 (10/96) |
| 9121/480/D | 10/27/96 | 19.75 | 19 | 20 | 13.78 | 4.29 | 4.7/4.2 (10/96) |
| Value | | $44,275,948 | $48,442,600 | $45,334,670 | $44,702,292 | $16,238,905 | |

| End of Lease Term | | I<br>RV as<br>% of LP | II<br>RV as<br>% of LP | III<br>RV as<br>% of LP | IV<br>RV as<br>% of LP | V<br>% of LP | VI<br>Retail/Wholesale |
|---|---|---|---|---|---|---|---|
| Type/Model Category | | | | | | | |
| 9021/720/E | 2/27/97 | 3.75% | 5-6% | 4% | 4.84% | 1.01% | 1.2/1.1% (1/97) |
| 9021/740/F | 2/27/97 | 7.50 | 10 | 8 | 10.95 | 2.11 | 2.4/2.2 (1/97) |
| 9021/820/G | 2/27/97 | 7.50 | 10 | 8 | 9.93 | 1.85 | 2.2/1.9 (1/97) |
| 9021/860/H | 2/27/97 | 7.50 | 10 | 8 | 10.50 | 2.04 | 2.3/2.0 (1/97) |
| 9021/900/I | 2/27/97 | 7.50 | 10 | 8 | 9.88 | 1.94 | 2.2/2.0 (1/97) |
| 9121/260/A | 7/27/97 | 11.00 | 14 | 10 | 8.54 | 1.37 | 1.6/1.5 (7/97) |
| 9121/320/B | 8/27/97 | 10.00 | 14 | 10 | 7.70 | 1.10 | 1.6/1.4 (7/97) |
| 9121/440/C | 8/27/97 | 10.00 | 13-14 | 10 | 9.08 | 1.10 | 1.6/1.4 (7/97) |
| 9121/480/D | 8/27/97 | 10.00 | 13 | 10 | 8.27 | 1.10 | 1.6/1.5 (7/97) |
| Value | | $25,418,962 | $34,257,000 | $26,769,965 | $31,607,012 | $6,341,682 | |

I.   M&S appraisal
II.   MAC appraisal
III.   ARI appraisal
IV.   Mr. Page's appraisal using 8-year useful life.
V.   DMC Consulting Group (Mr. Daley's Expert Report)
VI.   DMC Residual Value Reports (Third Quarter 1993)

> b. <u>No Reasonable Possibility for Profit Existed</u>

Petitioners assert that RD Leasing had a reasonable opportunity to earn a profit from the transaction based upon the forecasts of residual values made by the appraisers in 1993. Petitioners insist that the forecasts of residual values of the equipment were realistic. For the reasons set forth hereinafter, we conclude that the sale-leaseback transaction involved herein had no realistic potential to earn a meaningful profit.

In order to hold that tax avoidance was not the sole motivation for the transaction, we must determine that a profit was <u>reasonably</u> likely. <u>Estate of Thomas v. Commissioner</u>, 84 T.C. 412, 440 n.52 (1985). On an objective basis, we conclude that RD Leasing had no reasonable prospect for pretax profit.

The key to profitability rested in achieving the projected residual values for the equipment on the early or final termination Dates.[20] The record reveals that forecasting residual values is inherently difficult in light of the fact that a forecaster's predictions rely upon future economic events and trends.

---

[20] The estimated yields from the perspective of RD Leasing was as follows:

|  | Early Termination | Final Termination |
|---|---|---|
| September projections | 6.60% | 14.00% |
| December projections | 6.70 | 14.10 |
| Mr. Fleming's analysis | 5.74 | 12.95 |

Reasonable people can differ.  Many of the experts agreed that "residual value forecasting is more an art than a science" (and that forecasting computer residual values was similar to predicting the stock market).

We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment.  Chiu v. Commissioner, 84 T.C. 722, 734 (1985).  We may accept or reject expert testimony as we, in our best judgment, deem appropriate. Helvering v. Natl. Grocery Co., 304 U.S. 282 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285.  On the basis of our analysis of the transaction, and the methods of evaluation employed by each expert, we find that petitioners' experts overvalued the residual value of the equipment and that respondent's experts undervalued it.

Petitioners' experts posit that several unforeseen factors resulted in RD Leasing's failure to realize the projected residual values of the computers: (1) The introduction and commercial success of a new technology by IBM, called CMOS[21] (complementary metal oxide semiconductor), and IBM's failure to provide a "path" by which existing mainframes could be upgraded; (2) IBM's

---

[21]    CMOS processors had the following advantages:  they cost less than 25 percent of the list price of IBM's older mainframes; they required substantially less floor space; they did not require dedicated environmental support (i.e., they were air cooled instead of water cooled); they could be maintained for 50 percent less than older machines; and they could be configured to process data in less time.

announcement that it would no longer publish list prices for its 9021 and 9121 computer models, and that it would provide discounts to purchasers of those models in order to retain its market share; (3) increased competition from other manufacturers (such as Amdahl Computer Corp. and Hitachi Data Systems, Inc.); and (4) IBM's adoption of a "market basket approach", whereby IBM bundled hardware, software, and services into a single package, charging a single price.

Respondent's experts testified that in 1993 the mainframe market community was aware that IBM would be introducing new technology[22] which would shorten the lives (and adversely affect the residual values) of the IBM 9021 and 9121 models; however, they acknowledged that the specifics of the new technology were unknown. Ms. Middleton acknowledged that in the fall of 1993, there was some speculation as to whether IBM could successfully develop CMOS technology, and if IBM could, when IBM would be able to bring a product (using that technology) to market.

The September 1993 ARI appraisal claims that the "unusual pessimism" of the residual value estimates by the Gartner Group, IDC, and DMC are the result of several assumptions, including the prediction that "IBM will introduce revolutionary technology in January 1996 and that the value of * * * [the computers] will

---

[22] A Nov. 10, 1993, New York Times article reported that IBM had introduced a big new computer to replace its antiquated mainframe line.

approach their estimated salvage value of 1% of list within one year after the announcement."

Additionally, the DMC Residual Value Report for the third quarter 1993 forecast commentary for the IBM 9021 models states that the lack of a list price was bothersome to most users because of the lack of a reference point to begin negotiations. The report indicates that there also was no list price for the IBM 9121 models. Thus, at the time of the transaction, IBM no longer provided list prices and the lack of list prices was not an unforeseeable event.

We think the market forces that resulted in a rapid decline in the value of the equipment were predictable in 1993 and, at a minimum, should not have been ignored by the appraisers and petitioners' experts in estimating the residual values.

The M&S report states that IBM typically introduces a new series (or family) of mainframes every 3.5 to 5 years. Mr. Page, a vice president of M&S, testified as an expert for petitioners in this case. His estimate of the residual value of the computers is based upon a chart from a study he prepared for M&S in spring 1993 using a 10-year useful life. His age/life depreciation curve was based upon an annual study that he prepared beginning in 1980 and continuing through 1992. The data for this study came from the January issues of the "Computer Price Guide" (recognized as the most authoritative source of secondary market information). In 1993 when he prepared the chart, he was aware of the fact that "the

rate of technological changes was accelerating." He did not shorten the useful life; instead, he reduced the value by 10 percent for years 1 to 8 and a lesser amount for years 9 and 10.

Petitioners' experts assert that respondent's experts failed to take into account the "foot print" value when estimating the residual value of the equipment. The "foot print" value is the value that accrues to a computer that is on lease. It includes the ability to upgrade. Significant profits can be made from upgrades. The record shows, however, that RD Leasing did not have the benefit of the foot print. Rather, Comdisco had the right to that benefit.

All the experts opined that if the residual value estimates of MAC, M&S, and ARI were valid, then the lease would appear to have economic substance before taxes. However, we find that the estimated values provided by petitioners' experts are not reliable as estimates of residual values of the equipment. Those estimates inflate the residual values by including the "foot print" value and ignoring predictable market events that affected the values negatively. In sum, we do not accept the analyses and conclusions of petitioners' experts as to residual values.

Petitioners' experts assert that residual values for January 1994, as set forth in the October 1992 DMC Residual Value Report, were extremely low. They assert that the DMC forecasts undervalued the residual values of the IBM 9021 models by up to 186 percent and the IBM 9121 models by up to 13 percent. In our opinion, the predictions of the earlier DMC Residual Value Report would have

been less accurate than the report available at the time of the transaction, in part because they were made shortly after the computers were first introduced by IBM. Increasing the residual values forecast in the DMC Residual Value Report available at the time of the transaction by the undervaluation percentages provided by petitioners' expert Mr. Callahan for each model, a reasonable estimate of the residual value of the equipment would have been as follows:

Computation of Residual Value
Full Term

| Type/Model/ Category | List Price (LP) | DMC/(Increase) | | | Amount |
|---|---|---|---|---|---|
| 9021/720/E | $35,412,247 | 1.2% (2.6) | 3.12% | | $1,104,862 |
| 9021/740/F | 12,336,045 | 2.4 (1.5) | 3.60 | | 444,098 |
| 9021/820/G | 68,624,690 | 2.2 (1.5) | 3.30 | | 2,264,615 |
| 9021/860/H | 40,808,478 | 2.3 (1.5) | 3.45 | | 1,407,892 |
| 9021/900/I | 139,926,914 | 2.2 (1.5) | 3.30 | | 4,617,588 |
| 9121/260/A | 4,637,115 | 1.6 (1.1) | 1.76 | | 81,613 |
| 9121/320/B | 18,186,545 | 1.6 (1.1) | 1.76 | | 320,083 |
| 9121/440/C | 6,923,363 | 1.6 (1.1) | 1.76 | | 121,851 |
| 9121/480/D | 14,427,399 | 1.6 (1.1) | 1.76 | | 253,922 |
| Total | | | | | 10,616,524 |

Early Termination Date

| 9021/720/E | $35,412,247 | 2.0% (2.6) | 5.20% | $1,841,437 |
|---|---|---|---|---|
| 9021/740/F | 12,336,045 | 6.1 (1.5) | 9.15 | 1,128,748 |
| 9021/820/G | 68,624,690 | 5.5 (1.5) | 8.25 | 5,661,537 |
| 9021/860/H | 40,808,478 | 5.5 (1.5) | 8.25 | 3,366,699 |
| 9021/900/I | 139,926,914 | 5.4 (1.5) | 8.10 | 11,334,080 |
| 9121/260/A | 4,637,115 | 5.2 (1.1) | 5.72 | 265,243 |
| 9121/320/B | 18,186,545 | 4.7 (1.1) | 5.17 | 940,244 |
| 9121/440/C | 6,923,363 | 4.5 (1.1) | 4.95 | 342,706 |
| 9121/480/D | 14,427,399 | 4.7 (1.1) | 5.17 | 745,897 |
| Total | | | | 25,626,591 |

We find that at the time of the transaction, the estimated residual value of the equipment for the final termination dates was

no greater than $10,616,524 and for the early termination dates was no greater than $25,626,591.

The projected balance due on the balloon notes at the end of the full term of the lease was $20,335,186, and at the early termination date the projected balance was $25,582,611. Consequently, RD Leasing had no realistic potential to recover its investment or to earn a pretax profit.

In sum, we conclude that under the objective economic substance test, the leveraged sale-leaseback transaction involved herein had no reasonable opportunity for economic profit. We now turn our attention to whether RD Leasing/Norwest was motivated by any business purpose apart from obtaining tax benefits.

c.  RD Leasing/Norwest Was Not Motivated by Any Business Purpose Other Than Obtaining Tax Benefits

The proper inquiry for the business purpose test is "whether the taxpayer was induced to commit capital for reasons only relating to tax considerations or whether a non-tax motive, or legitimate profit motive, was involved." Shriver v. Commissioner, 899 F.2d at 726. In other words, the business purpose test is a subjective economic substance test. In making a "subjective analysis of the taxpayer's intent", we review such factors as the depth and accuracy of the taxpayer's investigation into the investment. Id. To the extent the taxpayer's subjective intent is material, we also consider factors that are arguably relevant to the inquiry.

Petitioners posit that, on a subjective basis, RD Leasing, NEFI, and Norwest acted in a businesslike manner and were not motivated solely by tax considerations. But we are not satisfied that Norwest/RD Leasing (through its executive employees) believed that the projected residual values were both realistic and attainable.

In analyzing whether a taxpayer was induced to commit capital for reasons relating only to tax considerations or whether a legitimate profit motive was involved, the following factors are particularly significant: (1) The presence or absence of arm's-length price negotiations, Helba v. Commissioner, 87 T.C. 983, 1004 (1986), affd. without published opinion 860 F.2d 1075 (3d Cir. 1988); see also Karme v. Commissioner, 73 T.C. 1163, 1186 (1980), affd. 673 F.2d 1062 (9th Cir. 1982); (2) the relationship between the selling price and the fair market value, Zirker v. Commissioner, 87 T.C. 970, 976 (1986); Helba v. Commissioner, supra at 1005-1007, 1009-1011; (3) the structure of the financing, Helba v. Commissioner, supra at 1007-1011; (4) the degree of adherence to contractual terms, id. at 1011; (5) the reasonableness of the income and residual value projections, Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 204-207; and (6) the insertion of other entities, Helba v. Commissioner, supra at 1011. Our application of these factors to the transaction involved herein follows.

> i.  Presence or Absence of Arm's-Length Price Negotiations

Arm's-length bargaining is an obvious characteristic of commercially valid transactions. Id.; see also Karme v. Commissioner, supra. To determine that an arm's-length transaction took place, we must find that the buyer was motivated to secure the lowest purchase price possible and, conversely, that the seller looked to obtain the highest price. See Fox v. Commissioner, 80 T.C. 972, 1009 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinion 734 F.2d 9 (3d Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5, 6-7, 9 (3d Cir. 1984).

Here, it is evident that Ms. Grossman, who reviewed and recommended the transaction for NEFI, had little interest in securing the lowest purchase price for the computers. Indeed, the opposite was true; the greatest projected profits stemmed from tax deductions which in turn increased as the purchase price increased. Cf. Patin v. Commissioner, 88 T.C. 1086, 1122 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989); Ferrell v. Commissioner, 90 T.C. 1154, 1186 (1988).

Nothing in any of the papers related to the negotiations indicate that Ms. Grossman (or for that matter Mr. Parmentier) ever attempted to negotiate a purchase price for the computers in an amount less than that set forth in Comdisco's proposal. Similarly, there is no evidence that Ms. Grossman (or Mr. Parmentier) negotiated to increase the amount of the rent payable under the lease, to reduce the amount of the cash to be invested, or to reduce the interest rates payable on the notes.

Succinctly stated, there is no evidence of any arm's-length negotiations by anyone in the sale-leaseback transaction at issue. Rather, the participants allowed Comdisco to arrange all aspects of the transactions. Moreover, the record is devoid of evidence that the purchase price was in any way determined with a true regard for the profitability of the activity. Brannen v. Commissioner, 78 T.C. 471, 509 (1982), affd. 722 F.2d 695 (11th Cir. 1984); see also Helba v. Commissioner, supra at 1005-1011. And the lack of arm's-length negotiations indicates that NEFI did not enter into the transaction for a legitimate profit purpose.

> ii. The Relationship Between the Selling Price and the Fair Market Value

In this case, all but $15 million of the selling price was financed by Comdisco. The transaction was arranged so that the payments due on the financing were offset by the rents payable by Comdisco. In fact, the rents were determined by reference to the purchase price. Therefore, the selling price and the fair market

value of the equipment at the time of the purchase had little effect on the pretax profitability of the transaction.  The pretax profitability was dependent on the residual value at the early termination date or the final termination date; the overall profitability was dependent on the tax savings.  See Zirker v. Commissioner, supra at 976; Helba v. Commissioner, supra at 1005-1007, 1009-1011.

### iii. The Structure of the Financing

The structure of the financing is an important factor in evaluating the claimed economic substance of the sale-leaseback transactions.  Helba v. Commissioner, supra at 1007-1011.  In this case, most of the purchase price of the properties was financed by debt that in reality was functionally identical to nonrecourse obligations.

On numerous occasions, courts have found that a disproportionately large amount of nonrecourse debt included in the purchase price of a piece of property indicates that a transaction lacks economic substance. See, e.g., Waddell v. Commissioner, 86 T.C. 848, 902 (1986), affd. per curiam 841 F.2d 264 (9th Cir. 1988); Elliott v. Commissioner, 84 T.C. 227, 238 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Estate of Baron v. Commissioner, 83 T.C. 542, 552-553 (1984), affd. 798 F.2d 65 (2d Cir. 1986).  This is especially true when, as a practical matter, there is little possibility that the debt will ever be paid.

RD Leasing was not liable to a third party for the debt. Unlike the transaction in Frank Lyon Co. v. United States, 435 U.S. 561 (1978), if Comdisco had failed to make its lease payments, RD Leasing would not have had to provide its own capital to make mortgage payments to a third party. If RD Leasing did not make its final balloon payments on the equipment, Comdisco's only remedy was to retake the equipment. Thus, RD Leasing had the option to abandon the equipment, leaving Comdisco no recourse against RD Leasing.[23]

The transaction did not occur on a public market but rather in an environment controlled by Comdisco and NEFI. When the sale-leaseback transaction involved herein was proposed, Mr. Hastings used the M&S report to interpolate the values stated therein to arrive at values relevant to the specific dates in the proposed transaction. He then presented these interpolated numbers to Greg Barwick, one of M&S's appraisers. The cost of the computers, the financing of the purchase price (including the interest rates), and the rents, as well as the estimated residual values, were easily manipulated to project a pretax profit.

NationsBank's records show that the bank treated the "purchase" of the rents receivable as a loan to Comdisco and anticipated prepayment by March 28, 1994. The bank's records

---

[23] The equipment was Andantech's only asset, and the Andantech interest was RD Leasing's principal asset (RD Leasing, however, was required to maintain sufficient investments to redeem Mr. Parmentier's preferred stock).

indicate that Comdisco approached NationsBank to "provide financing" for a sale/leaseback transaction involving a lease receivable purchase with Comdisco as the obligor. NationsBank expected the transaction to generate "$168,000 in net interest income for assuming a short-term, unsecured credit position with Comdisco". Although Comdisco had historically prepaid each receivable purchase transaction funded by NationsBank, Comdisco could elect not to prepay. "In this situation, NationsBank would hold a 36 month, unsecured loan to Comdisco at 75bp."

Under the terms of the term note for the purchase of the equipment, Andantech's sale of the rents to NationsBank accelerated the term note. Andantech directed NationsBank to wire transfer the proceeds from the rent sale ($87,805,802) to Comdisco in payment of Andantech's obligations to Comdisco under the term note. NationsBank did so, and Comdisco canceled the term note.

The rents owed by Comdisco before the early termination date were calculated to equal the amount due on the term note. The sale of those rents to NationsBank was in fact a short-term loan to Comdisco, and Andantech was required to use the proceeds to pay off the term note. There was no substance to the financing of the transaction. See Mapco Inc. v. United States, 556 F.2d at 1110.

> iv. The Degree of Adherence to Contractual Terms

A transaction having economic substance has as one of its characteristics an intent by the parties of having their agreements

enforced. The parties' failure to enforce their agreements indicates that the transaction does not conform to economic realities. Helba v. Commissioner, 87 T.C. at 1011; cf. Arrowhead Mountain Getaway, Ltd. v. Commissioner, T.C. Memo. 1995-54 (finding of sham transaction supported by showing that promoter was "notably careless and unbusinesslike" in documenting and altering legal relationships of the partnership), affd. 119 F.3d 5 (9th Cir. 1997).

In the instant matter, Comdisco had the right to substitute replacement equipment if the end user made a bona fide offer to purchase the computer. In that event, RD Leasing had the right to request reasonable documentation from Comdisco before transferring title pursuant to a bill of sale.

In April 1994, one of the end users purchased the IBM 9021 computer equipment it subleased from Comdisco. The computer was one that had been sold to Andantech. Comdisco elected to substitute replacement equipment. But Comdisco failed to provide notice to Andantech that it was exercising its right to substitute replacement equipment and did not follow the procedures for substitution required by the equipment lease.

We are also mindful that Comdisco provided Ms. Grossman with location reports relating to the equipment on March 1, 1994, February 27, 1995, and February 28, 1996. The 40 mainframe computers that were the subject of the sale-leaseback were identified by serial number in the location reports. The computers

shown in the reports had the same serial numbers as those that were on the 1993 bill of sale. Ms. Grossman was unaware that Comdisco had substituted replacement equipment for the equipment purchased by the end user.

When Comdisco exercised its early termination option, the 1996 bills of sale conveyed back to Comdisco the identical computers that Andantech had acquired pursuant to the 1993 bill of sale. The serial numbers on the 1996 bills of sale were identical to those on the 1993 bill of sale. Thus, the 1996 bills of sale inaccurately reflect that Comdisco never replaced any of the computers (i.e., did not substitute a different computer for any of the original equipment). Andantech never transferred title to the end user. Comdisco treated the equipment as its own and transferred ownership of the equipment to the end user.

We are also mindful that, as Dr. Schallheim points out, under the schedule of rents, Andantech did not sell all of the rents to NationsBank. Comdisco should have paid $2,711,993 of rent to Andantech. Petitioners' expert, Mr. Fleming, included those rents in his analysis of the profit potential. Petitioners argue that those rents should be included in evaluating the profit potential, but they fail to explain why Andantech never sought to collect the rents.

The low degree of adherence to the entities' contractual terms, particularly those relating to the actual ownership and the right to transfer ownership to a third party, indicates a lack of

substance to the transaction.  Rose v. Commissioner, 88 T.C. 386, 410-411 (1987), affd. 868 F.2d 851 (6th Cir. 1989); Helba v. Commissioner, 87 T.C. at 1009.

v.   The Reasonableness of the Income and Residual Value Projections

We have examined the reasonableness of projections of income expected to emanate from a transaction as a means of evaluating its economic substance.  See, e.g., Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 204-207.

We are mindful that it is inappropriate to use hindsight in determining whether residual projections were correct.  However, in 1993, the public was aware that IBM was developing CMOS, which, if and when brought to market, would affect the normal depreciation curve.  We find it difficult to believe that NEFI, being actively involved in the financing and leasing of computers, was unaware of the potential that such events could occur.

Ms. Grossman received three appraisals from Comdisco.  Ms. Grossman testified that she did not have "a sufficient level of comfort" with only one (the M&S) appraisal, and she requested additional appraisals.  She admitted, however, that the MAC appraisal provided little information.  The ARI appraisal discloses that the appraisal would be used for support of true lease requirement related to Federal taxation and as support in the investment decision process.  The report clearly states that industry publications such as Gartner Group, IDC, and DMC forecast

significantly lower residual values.  Ms. Grossman admitted that she wanted the file to show that she had looked for as much information as she could.  In our opinion, the appraisals provided by Comdisco were nothing more than an attempt to color the transaction with legitimacy.   Although NEFI had entered into many other leveraged sale-leaseback transactions and had expertise in this area, it failed to use any of its expertise in analyzing the residual values.   In fact, the CAP places little value on the collateral (the value of the equipment).

Further, the testimony of Ms. Grossman at trial indicates that NEFI officials knew that there was a high risk that the transaction would result in a loss.   Ms. Grossman testified that the transaction was too large for NEFI, and that it was more appropriate for Norwest.  That claim is contradicted by the fact that the transaction was conducted through RD Leasing, at the time an inactive shell corporation without any other assets.  Ms. Grossman admitted that if anything went wrong with the deal, NEFI officials would not receive bonuses.  RD Leasing was used because the corporate officers did not want any losses from the transaction to be attributed to NEFI.   Ms. Grossman's admission leads us to conclude that she was aware that it was unlikely that any pretax profit would be made on the transaction.

We are satisfied that at the time Norwest/RD Leasing entered into the sale-leaseback transaction involved herein, the Norwest/NEFI executives did not reasonably believe that an economic

profit, independent of tax benefits, was attainable and knew that a genuine risk of loss existed.  The projections showed that, regardless of any pretax profit, Norwest/NEFI would realize an after-tax profit ranging from 92 to 101 percent.  NEFI never considered the financial consequences of the transaction without the prior stripping of the rents from the transaction.  A reasonable person would not believe that there was a basis for entering into the transaction other than for the acquisition of tax benefits.  See Helba v. Commissioner, supra at 1012.

### vi.  Insertion of Other Entities

In determining a lack of economic substance, the fact the parties created and/or used intermediate entities for no valid business purpose is of significance.  See, e.g., id. at 1011. Here, Comdisco and NEFI created and/or used various entities to participate in the sale-leaseback transaction in order to strip the income from the transaction and for no other purpose. Specifically, Comdisco enlisted Messrs. Parmentier and de la Barre d'Erquelinnes to create Andantech and EICI.  Mr. de la Barre d'Erquelinnes then used EICI and the Trust, a charitable trust (tax exempt) previously created by Comdisco, as a depository for his interest after his participation had served its purpose.  And NEFI used RD Leasing (previously known as Radio Dealers Leasing, Inc.), an inactive shell corporation.

Our review of these factors shows that the sale-leaseback transaction at issue was not compelled or encouraged by business or

regulatory realities.  Rather, it was "shaped solely by tax-avoidance features that have meaningless labels attached".  Frank Lyon Co. v. United States, 435 U.S. at 583-584.

The Comdisco designed cross-border sale-leaseback transaction had no valid business purpose, independent of tax benefits.  It is one of those no-business-purpose transactions that would not have occurred, in any form, but for tax-avoidance reasons and, thus, is not to be given effect for Federal income tax purposes.  See, e.g., ACM Partnership v. Commissioner, 157 F.3d at 233-243 (sophisticated investment partnership formed and manipulated solely to generate a capital loss to shelter some of Colgate-Palmolive's capital gains); Karr v. Commissioner, 924 F.2d 1018, 1021 (11th Cir. 1991) (facade of energy enterprise developed solely to produce deductible losses for investors), affg. Smith v. Commissioner, 91 T.C. 733 (1988); Kirchman v. Commissioner, 862 F.2d 1486, 1488-1489 (11th Cir. 1989) (option straddles entered to produce deductions with little risk of real loss), affg. Glass v. Commissioner, 87 T.C. 1087 (1986); Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 91 (sale-leaseback of a computer by a car dealership, solely to generate depreciation deductions); cf., e.g., Frank Lyon Co. v. United States, supra at 582-584 (sale-leaseback was part of genuine financing transaction, heavily influenced by banking regulation, to permit debtor bank to outdo its competitor in impressive office space).

4.   The Transaction Was Not a Sale and the

### Financing Did Not Constitute Genuine Debt

Assuming arguendo that the transaction in issue was not a tax avoidance scheme devoid of economic substance, still petitioners would not be entitled to the claimed depreciation unless the transaction constituted a sale for Federal income tax purposes. See e.g., Packard v. Commissioner, 85 T.C. 397, 419 (1985). Depreciation is not predicated on legal title but rather on an actual investment in property. Mayerson v. Commissioner, 47 T.C. 340, 350 (1966). Likewise, to be deductible, interest must be paid on genuine indebtedness. Knetsch v. United States, 364 U.S. 361 (1960).

A sale-leaseback will not be respected for Federal tax purposes unless the lessor retains significant and genuine attributes of a traditional owner-lessor. Frank Lyon Co. v. United States, supra at 584; Levy v. Commissioner, 91 T.C. 838 (1988); Estate of Thomas v. Commissioner, 84 T.C. at 432. Accordingly, it is the existence of the benefits and burdens of ownership that determines how a sale-leaseback agreement will be treated for tax purposes. Frank Lyon Co. v. United States, supra at 582-584.

We have considered whether RD Leasing obtained and held sufficient benefits and burdens of ownership to be regarded as the owner of the equipment for Federal income tax purposes.

Factors of particular significance in determining whether a taxpayer is the owner of property are: (1) The taxpayer's equity interest in the property as a percentage of the purchase price; (2)

the existence of a useful life of the property in excess of the leaseback term; (3) renewal rental at the end of the leaseback term set at fair market rent; (4) whether the residual value of the equipment plus the cashflow generated by the rental of the equipment allows the investors to recoup at least their initial cash investment; (5) the expectation of a "turnaround" point which would result in the investors' realizing income in excess of deductions in the later years; (6) net tax benefits during the leaseback term less than their initial cash investment; and (7) the potential for realizing a profit or loss on the sale or re-lease of the equipment. Levy v. Commissioner, supra; Torres v. Commissioner, 88 T.C. at 721; Gefen v. Commissioner, 87 T.C. 1471, 1490-1495 (1986); Mukerji v. Commissioner, 87 T.C. 926, 967-968 (1992); Estate of Thomas v. Commissioner, supra at 433-438.

Here, the residual value plus the cashflow would not enable RD Leasing to recoup its $15 million investment. Additionally, there was no turnaround point that would result in RD Leasing's realizing income in excess of deductions--the net tax benefits greatly exceeded RD Leasing's initial investment. And RD Leasing had no potential for realizing a profit on the sale or re-lease of the equipment.

Further, in this case, the economics of the transaction were such as to mandate that Comdisco would exercise its early termination option and reacquire the equipment. This is so because the estimated residual value of the equipment at the early

termination date was $44,275,948; the balance on the balloon notes as of the early termination date totaled $25,582,611, and the early termination supplement was $343,856. If the equipment had a value equal to the $44,275,948 estimated residual value, in order to repurchase the equipment Comdisco would have to pay $19,037,193 (the fair market value $44,275,948, plus the $343,856 supplement, less the $25,582,611 balance due on the balloon notes).

Thus, it is clear in this case that the parties never intended to permanently transfer ownership of the equipment to Andantech. Consequently, the transaction did not constitute a sale for Federal tax purposes. Even if the estimated residual value set forth in the proposal had been realistic, RD Leasing's $4 million profit would have been attributable to contract rights rather than to a depreciable ownership interest in the equipment.

By contrast, in the Frank Lyon Co. case, "it was highly unlikely, as a practical matter, that any purchase option would ever be exercised." Frank Lyon Co. v. United States, 435 U.S. at 569-570.

In this case, the seller-lessee, Comdisco, retained an additional economic interest in the equipment. Comdisco's right to substitute equipment gave Comdisco the right to the difference between the value of the equipment to the end user and the value on the open market. The sale-leaseback agreements did not alter Comdisco's relationship to the end users or diminish Comdisco's control over the equipment. Comdisco never relinquished the

burdens and benefits of owning the equipment.

In sum, although RD Leasing had no realistic hope of realizing a profit on the investment, the tax benefits generated were more than sufficient to cover RD Leasing's potential losses.  Looking to the substance of the transaction, we conclude that RD Leasing "did not purchase or lease a computer, but rather, paid a fee * * * in exchange for tax benefits."  Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 95 (citation omitted).

Our analysis leads us to conclude that RD Leasing did not obtain sufficient benefits and burdens of ownership to be regarded as the owner of the equipment for Federal income tax purposes.  Consequently, Norwest/NEFI is not entitled to claim depreciation deductions for the equipment.  The $15 million payment by RD Leasing was simply the mechanism by which Norwest/NEFI became involved in the transaction.  And, in our opinion, the payment was intended to secure tax benefits, not an interest in depreciable property or in any economically viable project.  Falsetti v. Commissioner, 85 T.C. 332, 347 (1985).

Similarly, as discussed supra pp. 99-102, the seller financing arrangement did not constitute bona fide debt; consequently, Norwest/NEFI is not entitled to a deduction for interest.

D.   Conclusion

In Higgins v. Smith, 308 U.S. at 476-477, the Supreme Court stated:

There is no illusion about the payment of a tax exaction.

> Each tax, according to a legislative plan, raises funds to carry on government. The purpose here is to tax earnings and profits less expenses and losses. If one or the other factor in any calculation is unreal, it distorts the liability of the particular taxpayer to the detriment or advantage of the entire tax-paying group. * * *

The sale-leaseback transaction was designed by Comdisco to create just such a distortion.

It is axiomatic that taxpayers may structure transactions to take advantage of tax benefits. But "After a certain point, * * *, the transaction ceases to have any economic substance and becomes no more than a sale of tax profits." Hines v. United States 912 F.2d 736, 741 (4th Cir. 1990). Here, the evidence in the record clearly indicates that the investment scheme devised and orchestrated by Comdisco "reached the point where the tax tail began to wag the dog." Id.

To conclude, the record demonstrates that the sale-leaseback transaction involved herein was not bona fide and was, from an economic viewpoint, unreasonable. Under the theories advanced by respondent, the transaction should not be respected for Federal tax purposes. Consequently, we hold that (1) Andantech's claimed 12/10/93 short period should be disregarded, (2) Andantech is not required to include the income from the sale of the rents and is not entitled to deduct $2,143,937 as expenses from other rental activities for the 12/31/93 short period, and (3) Andantech is not entitled to deduct $50,069,397 of similar expenses for 1994.

To reflect the foregoing,

Decisions will be entered for respondent in docket Nos. 15532-98 and 6348-00.

An appropriate decision will be entered in docket No. 4277-00.



**APPENDIX A**
**FORMATION OF PARTNERSHIP**
**SEPTEMBER 27, 1993**



APPENDIX B
SALE OF EQUIPMENT TO PARTNERSHIP
SEPTEMBER 28, 1993

# APPENDIX C
# LEASEBACK TO COMDISCO
# SEPTEMBER 28, 1993



**COMDISCO**

**Lease of Equipment
for 41-47 Months**

**ANDANTECH**

**APPENDIX D**
**SALE OF COMDISCO RENTS**
**OCTOBER 29, 1993**

COMDISCO

Wire Transfer of $87,805,802

Cancellation
of Term Note

ANDANTECH

Sale of Comdisco
Rents

NATIONSBANK

$87,805,802

**APPENDIX E**
**CONTRIBUTION OF 2% ANDANTECH MEMBERSHIP INTEREST**
**DECEMBER 9, 1993**





APPENDIX F
TRANSFER OF 98% ANDANTECH MEMBERSHIP INTEREST
DECEMBER 10, 1993

